Merrimack
No. 2005-740

## IN THE MATTER OF THE LIQUIDATION OF THE HOME INSURANCE COMPANY

Argued: June 7, 2006
Opinion Issued: December 5, 2006

*Rackemann, Sawyer & Brewster*, of Boston, Massachusetts (*J. David Leslie* and *Eric A. Smith* on the brief, and *Mr. Leslie* orally), and *Kelly A. Ayotte*, attorney general (*J. Christopher Marshall*, attorney, on the brief), for the petitioner, the Commissioner of Insurance of the State of New Hampshire as Liquidator of the Home Insurance Company.

*Lovells*, of New York, New York (*Gary S. Lee & a.* on the brief, and *Pieter Van Tol* orally), and *Orr & Reno, P.A.*, of Concord (*Ronald L. Snow* and *Lisa Snow Wade* on the brief), for intervenors Century Indemnity Company, Pacific Employers Insurance Company, ACE Property and Casualty Insurance Company, and ACE American Reinsurance Company.

*Downs Rachlin Martin, PLLC*, of Burlington, Vermont (*Andre D. Bouffard* and *Eric D. Jones* on the brief, and *Mr. Bouffard* orally) for intervenor Benjamin Moore & Company.

*Rebecca W. McElduff*, of Kansas City, Missouri, by brief, and *Sheehan Phinney Bass + Green, P.A.*, of Manchester (*Bruce A. Harwood* and *James P. Harris* on the brief) for the National Association of Insurance Commissioners, as *amicus curiae*.

*Wiggin & Nourie, P.A.*, of Manchester (*Doreen F. Connor* on the brief), and *Dykema Gossett PLLC*, of Detroit, Michigan (*Suzanne Sahakian* on the brief) for the National Conference of Insurance Guaranty Funds, as *amicus curiae*.

*Orr & Reno, P.A.*, of Concord (*Lisa Snow Wade* on the brief), and *Tracy W. Laws* and *Matthew T. Wulf*, of Washington, D.C., by brief for the Reinsurance Association of America, as *amicus curiae*.

DUGGAN, J. The intervenors, Century Indemnity Company, Pacific Employers Insurance Company, ACE Property and Casualty Insurance Company, ACE American Reinsurance Company (collectively, the ACE Companies) and Benjamin Moore & Company (BMC), appeal orders of the Superior Court (*McGuire*, J.) granting the motion of the petitioner, the New Hampshire Commissioner of Insurance (commissioner) as liquidator of the Home Insurance Company (Home), for approval of a proposed agreement with certain insureds and reinsureds of Home. Under the proposed agreement, these entities would receive payments of approximately $78 million in exchange for filing reinsurance claims against Home. The superior court granted the commissioner's motion upon finding that: (1) the commissioner was authorized to enter into the proposed agreement; (2) the proposed agreement was necessary to maximize the recovery of Home's assets and protect the interests of the insureds and creditors; and (3) the proposed agreement was fair and reasonable. We affirm.

The record supports the following facts. The ACE Companies are reinsurers of Home. BMC is a policyholder claimant "with numerous open liability claims" against Home. Prior to becoming insolvent, Home was domiciled in New Hampshire, and licensed and regulated by the New Hampshire Insurance Department. Home operated an unincorporated branch in the United Kingdom, its "UK Branch," through which it wrote property and casualty insurance and reinsurance.

Home conducted business in the United Kingdom as a member of the American Foreign Insurance Association (AFIA), an unincorporated association of American insurance companies that wrote insurance and reinsurance. As a member of the AFIA, Home entered into insurance and reinsurance agreements (collectively, the AFIA treaties) with certain entities in the United Kingdom (collectively, the AFIA Cedents). Home then obtained reinsurance on these agreements from member companies in the AFIA and other third party reinsurers.

In 1984, CIGNA Insurance Company purchased the AFIA. As part of that transaction, Insurance Company of North America (INA), a subsidiary of CIGNA, entered into an Insurance and Reinsurance Assumption Agreement (assumption agreement) with Home and other participating members of the AFIA. Pursuant to the assumption agreement, INA assumed the insurance and reinsurance liabilities of Home with respect to Home's operations in the United Kingdom, and agreed to bear the related costs and expenses of administering this business. Significantly, the assumption agreement contains an insolvency clause requiring INA to pay obligations directly to Home, or Home's liquidator, in the event of Home's insolvency.

In 1996, as part of a corporate restructuring, Century Insurance Company (Century) succeeded to INA's rights and obligations under the assumption agreement and became required to reinsure Home for all of its obligations to the AFIA Cedents. Century became part of the ACE Companies in 1999, thereby obligating the ACE Companies to pay all claims submitted against Home by the AFIA Cedents under the AFIA.

Proceedings against Home under the Insurers Rehabilitation and Liquidation Act, RSA ch. 402-C (2006), were initiated when the commissioner petitioned the superior court for an Order of Rehabilitation for Home. On March 5, 2003, the superior court entered an Order of Rehabilitation for Home and appointed the commissioner to be Home's rehabilitator. On May 8, 2003, in conjunction with an application for an order of liquidation in New Hampshire, the commissioner petitioned the High Court of Justice in London (English Court) to appoint a Joint Provisional Liquidation (JPL) team for Home under English law. While this provisional liquidation proceeding took place in the United Kingdom, the liquidation of Home is under the primary jurisdiction of the superior court. On June 13, 2003, the superior court entered a liquidation order declaring Home insolvent and appointing the commissioner as the liquidator of Home's estate.

Pursuant to RSA 402-C:21, I (2006), RSA 402-C:25, VI (2006) and the superior court's liquidation order, the liquidator is vested with title to and charged with administering and collecting Home's assets for distribution to Home's creditors. All persons asserting claims against Home must file proofs of claim in the New Hampshire liquidation, and the liquidator's ability to collect reinsurance payments on claims made against Home depends upon the timely filing and proving of claims in Home's liquidation. A claim can only be submitted to a reinsurer if it is allowed by Home's estate, a process overseen by the liquidator and the superior court.

RSA 402-C:44 (2006) governs the order of distribution of claims from a liquidated insurer's estate, and establishes classes of claimants as part of the distribution process. After a fifty-dollar per claim deductible, "every claim in each class shall be paid in full or adequate funds retained for the payment before the members of the next class receive any payment." RSA 402-C:44. The statute also provides that "[n]o subclasses shall be established within any class." *Id.*

RSA 402-C:44 requires that classes of claims against an insolvent insurance company's estate be paid in the following order:

I. ADMINISTRATION COSTS. The costs and expenses of administration, including but not limited to the following: the actual and necessary costs of preserving or recovering the assets

of the insurer; compensation for all services rendered in the liquidation; any necessary filing fees; the fees and mileage payable to witnesses; and reasonable attorney's fees.

II. POLICY RELATED CLAIMS. All claims by policyholders, including claims for unearned premiums in excess of $50, beneficiaries, and insureds arising from and within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company . . . .

III. CLAIMS OF THE FEDERAL GOVERNMENT.

IV. WAGES.
(a) Debts due to employees for services performed, not to exceed $1,000 to each employee which have been earned within one year before the filing of the petition for liquidation. . . .
(b) Such priority shall be in lieu of any other similar priority authorized by law as to wages or compensation of employees.

V. RESIDUAL CLASSIFICATION. All other claims including claims of any state or local government, not falling within other classes under this section. . . .

VI. JUDGMENTS. Claims based solely on judgments. . . .

VII. INTEREST ON CLAIMS ALREADY PAID. Interest at the legal rate compounded annually on all claims in the classes under paragraphs I through VI from the date of the petition for liquidation or the date on which the claim becomes due, whichever is later, until the date on which the dividend is declared. . . .

VIII. MISCELLANEOUS SUBORDINATED CLAIMS. The remaining claims or portions of claims not already paid, with interest, as in paragraph VII . . . .

IX. PREFERRED OWNERSHIP CLAIMS. Surplus or contribution notes, or similar obligations, and premium refunds on assessable policies. . . .

X. PROPRIETARY CLAIMS. The claims of shareholders or other owners.

RSA 402-C:44, I-X.

The claims of the AFIA Cedents based upon their pre-liquidation reinsurance contracts with Home fall into the "all other claims" category of Class V. *See* RSA 402-C:44, V. The claims of BMC, as a policyholder of Home, are in Class II. The superior court determined that it is unlikely that there will be sufficient assets to make distributions to classes beyond Class II. The AFIA Cedents' claims—if paid to Home under the assumption agreement—would constitute the largest single asset in Home's estate and total approximately $231 million. Pursuant to the liquidation order, the AFIA Cedents must submit their claims against Home to the liquidator in order to obtain any recovery.

After liquidation proceedings had commenced, the liquidator proposed an agreement (the proposed agreement) between the Home estate and the AFIA Cedents, under which the AFIA Cedents would be required to submit all of their claims to the liquidator. Once these claims were allowed, the liquidator would submit them to the ACE Companies and other reinsurers of Home to recover reinsurance payments. In exchange for the filing of their claims, the liquidator would distribute a portion of this recovery directly to the AFIA Cedents, and use the remainder to pay creditors pursuant to the priority distribution provision of RSA 402-C:44. Under this arrangement, the AFIA Cedents would receive distributions of approximately $78 million. This figure corresponds to fifty percent of the $231 million less deductions for offsets and expenses associated with administering the agreement. The distributions would be made to the AFIA Cedents proportionately, based upon the value of their allowed claims against Home. The proposed agreement would prohibit the AFIA Cedents from seeking "cut-through" agreements, *i.e.*, direct agreements with the ACE Companies that bypass the liquidator.

By its own terms, the proposed agreement is subject to the approval of both a majority in number and seventy-five percent in value of the AFIA Cedents. It is also subject to approval by the superior court. Once approval is obtained from the superior court, the proposed agreement would be submitted to the English Court for approval. Upon approving the proposed agreement, the English Court would issue a "Global Liquidation Order," which would be filed with the Financial Services Agency (FSA), a government regulator of financial services in the United Kingdom. Upon the approval or non-objection of the FSA, the proposed agreement would become binding upon all creditors of Home, including the AFIA Cedents.

This litigation commenced when the liquidator filed a motion in the superior court seeking approval of the proposed agreement. The ACE Companies and BMC objected to the motion arguing, in pertinent part, that: (1) the liquidator lacked authority to enter into the proposed

agreement; (2) the proposed payments to the AFIA Cedents could not properly be classified as Class I administrative costs; and (3) the proposed agreement creates a subclass of creditors within Class V in violation of the statutory prohibition against subclasses. *See* RSA 402-C:44.

The superior court issued an order on April 29, 2004, which ruled that the liquidator was authorized under RSA 402-C:25 to enter into the proposed agreement with the AFIA Cedents, and that the proposed agreement was "consistent with the goals and purpose of the statute to protect the interests of the insureds and creditors." The ACE Companies and BMC appealed.

We issued an order on September 13, 2004, vacating the superior court's order. We directed the court to consider: (1) whether the superior court has an independent obligation to assess the fairness of the proposed agreement; and (2) whether the payment to the AFIA Cedents qualifies as an "administration cost" under RSA 402-C:44, I.

On remand, the superior court ruled that: (1) the payments to the AFIA Cedents are Class I "administration costs" because they constitute the "'actual and necessary costs of preserving or recovering the assets of the insurer' under RSA 402-C:44, I;" and (2) it has an independent obligation to assess the fairness of the proposed agreement. The superior court also ruled that the liquidator was authorized under RSA chapter 402-C to enter into the proposed agreement and that the liquidator's endorsement of the proposed agreement is "consistent with the broad purposes and goals of [RSA chapter 402-C] to protect the interests of insureds and creditors."

Following the issuance of the order on remand, the parties filed an interlocutory appeal to this court seeking a determination of whether, as a matter of law: (1) the liquidator is authorized by statute to enter into the proposed agreement with the AFIA Cedents; and (2) the payments to the AFIA Cedents qualify as administrative costs. We declined the appeal.

The superior court subsequently held an evidentiary hearing "to determine whether the [proposed] agreement is necessary to preserve and recover assets of the [Home] estate and whether the terms of the agreement are fair and reasonable." The court heard the testimony of the liquidator; the chief operating officer of Home, Jonathan Rosen; and JPL team members Sarah Ellis, Peter Bengelsdorf and Gareth Hughes. By order dated September 22, 2005, the superior court expressly held that the proposed agreement was both "necessary to preserve access to and marshal the AFIA reinsurances" and "fair and reasonable." The superior court granted the liquidator's motion for approval of the proposed agreement.

The ACE Companies and BMC appeal the superior court's orders, arguing that the trial court erred by ruling that: (1) the liquidator has

authority to enter into the proposed agreement; (2) payments to the AFIA Cedents under the proposed agreement constitute "administration costs" under RSA 402-C:44, I; and (3) the terms of the proposed agreement are fair and reasonable. We address each argument in turn.

## I. Liquidator's Authority

First, we address the ACE Companies' and BMC's argument that the superior court erred in holding that the liquidator has the authority under RSA chapter 402-C to enter into the proposed agreement. In particular, they argue that: (1) the liquidator's actions were inconsistent with RSA chapter 402-C because they violated the mandatory priority distribution in RSA 402-C:44; (2) nothing in the statute indicates that the legislature intended to grant the liquidator unfettered discretion; (3) courts in other states have refused to depart from statutory mandates, even where to do so would increase estate assets; and (4) allowing a deviation from the clear requirements of RSA 402-C:44 would open the door to similar agreements with other creditors or attempts by creditors to enhance their priority.

In response, the liquidator asserts that: (1) RSA chapter 402-C grants the liquidator broad authority to collect assets and gives "actual and necessary" collection costs Class I priority so that payment of those costs is consistent with the provisions of RSA 402-C:44; (2) RSA 402-C:44 contains no bar on payment of administration costs to lower priority creditors; and (3) the drafting notes to the most recent version of the Insurer Receivership Model Act specifically state that a liquidator has the right to pay Class I administration costs "to persons in any priority class where those . . . payments assist or result in the collection or recovery of property of the insurer for the benefit of creditors of the estate."

We begin our analysis by examining the language of the relevant provisions of RSA chapter 402-C.

> The interpretation of a statute is a question of law, which we review *de novo*. We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include.

*Woodview Dev. Corp. v. Town of Pelham*, 152 N.H. 114, 116 (2005) (citations omitted).

RSA 402-C:1, IV (2006) states the general purpose of chapter 402-C and provides, in pertinent part: "The purpose of this chapter is the protection of the interests of insureds, creditors, and the public generally . . . ." This is achieved through, among other things:

    (a) Early detection of potentially dangerous conditions in an insurer, and prompt application of appropriate corrective measures . . .

    (b) Improved methods for rehabilitating insurers . . . and

    (c) Enhanced efficiency and economy of liquidation . . . .

RSA 402-C:1, IV(a)-(c).

RSA 402-C:25 sets forth an extensive, nonexclusive list enumerating the powers of the liquidator, and provides that subject to the court's control, a liquidator may "[c]ollect all debts and moneys due and claims belonging to the insurer," and "do such other acts as are necessary or expedient to collect, conserve or protect its assets or property . . . ." RSA 402-C:25, VI. The statute also authorizes the liquidator to "[d]efray all expenses of taking possession of, [and] conserving . . . property of the insurer." RSA 402-C:25, IV. The statute further provides the liquidator with the authority "to do such other acts not herein specifically enumerated or otherwise provided for as are necessary or expedient for the accomplishment of or in aid of the purpose of liquidation." RSA 402-C:25, XXII. Thus, on its face, RSA 402-C:25 grants the liquidator broad authority to take all necessary and appropriate action in collecting the assets of an insolvent insurer.

Consistent with this authority, the statute provides that the necessary costs of collecting assets are a principal expense, giving Class I priority to "administration costs," which are defined as "[t]he costs and expenses of administration, including but not limited to the following: the actual and necessary costs of preserving or recovering the assets of the insurer . . . ." RSA 402-C:44, I. The ACE Companies and BMC contend that the priority provisions of RSA 402-C:44 facially prohibit administrative cost payments to an entity which is also a lower priority creditor. However, the plain language of RSA chapter 402-C contains no bar on payment of administration costs to lower priority creditors in order to collect an asset.

The ACE Companies assert that courts in other states have refused to depart from statutory mandates, even when to do so would increase the assets of an insolvent insurer's estate, citing *Kemper Reinsurance Co. v. Corcoran (In the Matter of Liquidation of Midland Ins. Co.)*, 590 N.E.2d 1186 (N.Y. 1992), and *Prudential Reinsurance Co. v. Superior Court*, 842 P.2d 48 (Cal. 1992), for support. While it is accurate that in both cases the courts reference the general rule of adhering to the priority of claims in the statutory scheme, both cases address a different issue not relevant to

our discussion; namely, whether reinsurance debts and credits generated between a reinsurer and the original insurer under the terms of their reciprocal contracts may be set off when the original insurer becomes insolvent. *See Midland Ins. Co.*, 590 N.E.2d at 1187-88, 1191; *Prudential Reinsurance Co.*, 842 P.2d at 50, 61-62.

The liquidator directs our attention to the most recent revision of the Insurer Receivership Model Act (IRMA), adopted by the National Association of Insurance Commissioners (NAIC), which explicitly recognizes that administrative cost payments to creditors to assist in the collection of assets for the benefit of a broad body of creditors are consistent with the priorities of distribution. He argues that we may properly consider IRMA in this context, because not only is RSA chapter 402-C consistent with IRMA, but we have previously relied upon NAIC comments to the Post-Assessment Property and Liability Insurance Guaranty Association Model Act, *see Benson v. N.H. Ins. Guaranty Assoc.*, 151 N.H. 590, 599 (2004).

The New Hampshire legislature has not adopted IRMA. However, RSA chapter 402-C is nearly identical to the 1967 Wisconsin Insurers Rehabilitation and Liquidation Act (Wisconsin Act), which the NAIC adopted as the "Model Act." *Compare* WIS. STAT. §§ 645.01-645.90 (1967) *with* RSA 402-C:1- :61 (2006). *See* 1 NAT'L ASS'N OF INS. COMM'RS, PROCEEDINGS OF THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS 241 (1969). IRMA is a recent revision of the Model Act. *See* 3 NAT'L ASS'N OF INS. COMM'RS, MODEL LAWS REGULATIONS AND GUIDELINES 555-1 to 555-96 (2006).

Section 801 of IRMA is entitled "Priority of Distribution," and is analogous to RSA 402-C:44. Section 801A(1) provides that the costs and expenses of administration are given Class I priority status. *See id.* at 555-83. Further, as in RSA 402-C:44, administrative costs and expenses include "[t]he actual and necessary costs of preserving or recovering the property of the insurer...." *Id.* In the drafting note to this subsection of section 801, the NAIC noted that:

> Implicit in the powers conferred on the liquidator under this Act ... is the right, subject to approval by the receivership court, to pay Class 1 administrative costs to persons in any priority class where those Class 1 administrative cost payments assist or result in the collection or recovery of property of the insurer for the benefit of creditors of the estate. Payments of administrative costs in these circumstances do not constitute distributions so as to circumvent priority classes or establish subclasses within a class.

*Id.* at 555-84. This note clarifies that in order to maximize the collection of estate assets, a liquidator is authorized to enter into agreements in order to encourage creditors to prosecute their claims, so long as the agreement results in a net benefit to creditors of the estate. Given the similarities between IRMA and RSA chapter 402-C, we conclude that the broad language of RSA 402-C:25 confers this same authority upon the liquidator.

█ The ACE Companies argue that affirming the superior court's orders "would set a precedent for wholesale violations of RSA 402-C:44." They contend that affirming the order would permit creditors to freely negotiate "individual percentage distributions depending on the value of their claim to the liquidation." We disagree. Although RSA chapter 402-C grants the liquidator broad authority to administer liquidation proceedings, the court oversees the entire process. Therefore, any agreement negotiated by the liquidator requires court approval. *See* RSA 402-C:25 (the liquidator must report to the court regularly on the progress of the litigation, and any actions the liquidator takes are "[s]ubject to the court's control"); RSA 402-C:45, I (the liquidator should "[a]s often as practicable … present to the court reports of claims against the insurer with his recommendations"); RSA 402-C:46, I (the liquidator shall distribute assets "[u]nder the direction of the court"). Since the liquidator's actions are closely supervised by the court, there is little risk that the priority provisions of RSA 402-C:44 will be violated.

We thus conclude that the superior court did not err in ruling that the liquidator has the authority under RSA chapter 402-C to enter into the proposed agreement.

## II. Administration Costs

We now address whether the payments to the AFIA Cedents under the proposed agreement constitute "administration costs" under RSA 402-C:44, I. As noted, RSA 402-C:44 provides that Class I claims must be paid in full before distributions may be made to any other classes. Class I claims include claims for administrative costs and expenses, which are:

> [t]he costs and expenses of administration, including but not limited to the following: the *actual and necessary costs* of preserving or recovering the assets of the insurer; compensation for all services rendered in the liquidation; any necessary filing fees; the fees and mileage payable to witnesses; and reasonable attorney's fees.

RSA 402-C:44, I (emphasis added). Class V claims are "[a]ll other claims including claims of any state or local government, not falling within other classes. . . ." RSA 402-C:44, V.

In ruling that the payments to the AFIA Cedents are Class I administrative costs, the superior court noted that "the provisions of RSA chapter 402-C are to be liberally construed and that the purpose of the statute is to protect insureds, creditors and the general public." It also "considered the nature and complexity of . . . [Home's] insurance and reinsurance business, and that its substantial involvement in the London market posed significant challenges to the Liquidator." The court "recognized the circumstances which put collection of the asset at risk, particularly the fact that the AFIA Cedents would have little reason to file and prosecute claims if neither setoff nor actual distribution were likely." In support of this position, the court cited to the testimony of the JPL team members. The superior court found that, under RSA 402-C:44, I, "the structure of the agreement was necessary to preserve and recover assets." It also stated that "with the agreement the Liquidator would be able 'to marshal assets to be distributed to creditors which would otherwise be unavailable.'"

The ACE Companies and BMC argue that the superior court's ruling that the payments to the AFIA Cedents are administration costs is "contrary to the language and clear intent of RSA 402-C:44, I." They first contend that the proposed payments to the AFIA Cedents cannot be qualified as "administration costs" because they arose from the pre-liquidation AFIA contracts, and that administration costs only arise from post-liquidation transactions. Second, they argue that the proposed agreement creates an impermissible subclass by splitting the Class V creditors into two groups. Third, the ACE Companies and BMC challenge the superior court's ruling that the payments to the AFIA Cedents were "necessary costs" of preserving Home's estate.

In arguing that the proposed payments to the AFIA Cedents cannot be qualified as "administration costs" because they arose from pre-liquidation transactions, the ACE Companies rely upon a line of bankruptcy cases holding that "administration costs" include only rights to payment that arise post-liquidation, and exclude claims that arise pre-liquidation. *See Mass Div. of Empl. and Training v. Boston Reg'l Med. Ctr.*, 291 F.3d 111, 125 (1st Cir. 2002); *Woburn Assoc. v. Kahn (In re Hemingway Transportation, Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992); *In re Food Barn Stores, Inc.*, 175 B.R. 723, 728 (Bankr. W.D. Mo. 1994). They urge us to apply the reasoning of the bankruptcy cases here, contending that the proposed agreement is based upon the AFIA Cedents' claims against Home, which arose from the pre-liquidation AFIA treaties.

The bankruptcy cases cited above involved the interpretation of 11 U.S.C.A. § 503 (Supp. 2006). Entitled "Allowance of administrative expenses," 11 U.S.C.A. § 503 (b)(1)-(8) enumerates a list of items that may be considered administrative expenses, such as "wages, salaries, and commissions for services rendered after the commencement of the case"; *id.* § 503 (b)(1)(A)(i), and "reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable" by statute, *id.* § 503 (b)(4).

We are not persuaded that the interpretation of "administrative expenses" in bankruptcy cases applies to the definition of "administration costs" in RSA 402-C:44, I. A comparison of the language of the respective statutes reveals that they differ in terms of what is meant by "administrative costs and expenses." Unlike the bankruptcy statute, which contains a specific list of items that constitute administrative expenses, RSA 402-C:44, I, defines administration costs more generally by including "the actual and necessary costs of preserving or recovering the assets of the insurer." This definition encompasses a much broader category of items and transactions than is found in the bankruptcy code.

Even if we were to assume that claims and rights to payment that arise pre-liquidation cannot constitute "administration costs" under RSA 402-C:44, I, we are not persuaded that the proposed payments to the AFIA Cedents arose pre-liquidation. The proposed payments do not arise from the AFIA Cedents' Class V claims themselves, but rather as an *inducement* for the AFIA Cedents to file claims in the liquidation in order to bring a net benefit to creditors of the estate. Thus, while the AFIA Cedents' claims against Home arose pre-liquidation, their right to payment under the proposed agreement will arise post-liquidation.

The ACE companies and BMC rely upon an insurance liquidation case in which the Georgia Court of Appeals refused to qualify claims that arose from pre-liquidation transactions as administrative expenses. *See Oxendine v. Comm'r of Ins. of North Carolina*, 494 S.E.2d 545 (Ga. Ct. App. 1997). They argue that the proposed payments to the AFIA Cedents are akin to the pre-liquidation claims in *Oxendine*, and cannot be classified as "administrative costs." We disagree.

In *Oxendine*, the Georgia Commissioner of Insurance (GCI) had settled claims of the North Carolina Commissioner of Insurance (NCCI) and FICA Marketing, Inc. (FICA) against an insurer during a court-approved rehabilitation of the insurer. *Id.* at 546-47. The rehabilitation efforts failed and the insurer was declared insolvent. *Id.* at 547. NCCI and FICA then asserted that their claims against the insolvent insurer were entitled to priority status as costs and expenses of administration. *Id.* The trial court overseeing the liquidation agreed, and GCI appealed. *Id.*

The *Oxendine* court reversed. Interpreting a provision similar to RSA 402-C:44, I, *see* GA. CODE ANN. § 33-37-41(1)(2005), it ruled that "[n]o reasonable definition of 'costs' or 'expenses' can include the claims which [NCCI and FICA] assert. These claims are for money which [NCCI and FICA] claim from [the insurance company's] estate and not administrative costs and expenses incurred." *Id.* at 548. *Oxendine* held that giving the claims of NCCI and FICA priority as Class I administrative expenses violated the mandatory priority set forth in the liquidation statute. *Id.*

We disagree with the ACE Companies and BMC that *Oxendine* applies to this case. In *Oxendine*, the claims brought by NCCI and FICA were settled claims against the insurer that arose pre-liquidation. The liquidation of the insurer did not change the fact that NCCI and FICA still had unpaid claims against the insurer that arose from their pre-liquidation right to payment. In this case, unlike in *Oxendine*, the AFIA Cedents' right to proposed payments will arise post-liquidation, based upon the proposed agreement. While the AFIA Cedents' Class V claims arose pre-liquidation, their right to payment for filing these claims in the liquidation proceeding will arise post-liquidation.

Moreover, we disagree that the proposed agreement creates an impermissible subclass by splitting Class V into two groups. Payments of Class I administration costs, by definition, do not constitute a "distribution" to a lower priority class, and therefore do not create a subclass of lower priority creditors.

The ACE Companies argue that even if the payments are administration costs, the superior court erred by ruling that they are "necessary costs" of preserving and recovering the assets of Home, within the meaning of RSA 402-C:44, I. After an evidentiary hearing, the superior court found that the proposed agreement was necessary because "the Liquidator could not have marshaled this asset absent the contingent payments. . . ." It also ruled that "the Liquidator has met his burden of proving that a reasonable liquidator under the circumstances would have concluded that the agreement was necessary to preserve access to and marshal the AFIA reinsurances."

First, the ACE Companies argue that "the [s]uperior [c]ourt applied the wrong standard in determining the necessity issue." They contend that the proper standard is "whether the AFIA Cedents, in the absence of the [Proposed] Agreement, would have filed and prosecuted their claims." They argue that the superior court erroneously applied the standard of "whether it was reasonable for the Liquidator to conclude that an agreement with the AFIA Cedents was necessary . . . ."

RSA 402-C:25, VI provides that the liquidator may take measures that "are necessary or expedient to collect, conserve or protect [the insurer's]

assets or property . . . ." We will assume, as the ACE Companies argue, that the appropriate standard is whether the AFIA Cedents, in the absence of the proposed agreement, would have filed and prosecuted their claims. In light of the superior court's finding that "the Liquidator could not have marshaled [$231 million in reinsurance payments on the AFIA Cedents' claims] absent the contingent payments," we are not persuaded that the superior court applied the incorrect standard in determining the necessity of the proposed agreement.

Next, the ACE Companies and BMC argue that "[a]n objective examination of the evidence reveals that the AFIA Cedents would have filed and prosecuted claims even in the absence of the Proposed Agreement." They contend that the AFIA Cedents had "several incentives for the filing and prosecution of reinsurance claims, including the preservation of set off, tax concerns and the possibility of a better than expected return for the estate." They also assert that "the AFIA Cedents' prosecution of their pre-liquidation claims would not cease once the level of setoff is reached . . . , nor would it be difficult or costly to prosecute the claims." Finally, the ACE Companies argue that the superior court erred by finding that there was "significant legal uncertainty" as to whether the AFIA Cedents could negotiate a cut-through deal with the ACE Companies because, under the terms of the assumption agreement, the AFIA Cedents could not legally negotiate a "cut-through" deal.

The liquidator contends that the superior court made a factual finding that "the AFIA Cedents would not file and prosecute claims in excess of offset without an incentive." The liquidator asserts that the testimony at the evidentiary hearing that the court found to be credible amply supports the conclusion that the agreement was necessary. Further, the liquidator asserts that the superior court properly found that "there was uncertainty over potential direct dealing between [the ACE Companies] and [the] AFIA Cedents to circumvent Home." He argues that *Nationwide Mutual Insurance. Co. v. Home Ins. Co.*, 150 F.3d 545 (6th Cir. 1998), *cert. denied*, 525 U.S. 1140 (1999), "left open the status of cut through" litigation, while *Koken v. Legion Insurance. Co.*, 831 A.2d 1196, 1236 (Pa. Commw. Ct. 2003), "showed cut through litigation is allowable on particular facts," and thus "the Court had ample reason to conclude that direct dealing was a credible threat."

We will uphold the superior court's findings and rulings unless they lack evidential support or are legally erroneous. *Cook v. Sullivan*, 149 N.H. 774, 780 (2003). We defer to the superior court's resolution of conflicting testimony, evaluation of credibility, and determination of the weight to be given evidence. *Id.*

After reviewing the record, we conclude that there was sufficient evidence to support the superior court's finding that the AFIA Cedents would not file and prosecute claims without a financial incentive. In particular, JPL team member Sarah Ellis testified that she interviewed representatives of several AFIA Cedent companies who informed her that because they were subordinated creditors, they saw no economic benefit to submitting claims to the Home Estate. JPL team member Gareth Hughes testified about his concern that creditors would have no economic incentive for prosecuting their claims. In addition, there was sufficient evidence to support the court's conclusion that cut-through litigation was a threat. Both Sarah Ellis and Gareth Hughes testified that the AFIA Cedents were in talks to form side agreements with the ACE Companies.

Furthermore, we agree that the *Nationwide* decision leaves uncertainty as to whether cut-through deals between the ACE Companies and the AFIA Cedents are legally permissible. In that case, Nationwide Mutual Insurance Company (Nationwide) purchased reinsurance from Home, which at that time was a member of the AFIA. *Nationwide Mutual Ins. Co.*, 150 F.3d at 546-47 & n.2. Subsequently, CIGNA Insurance Company and its subsidiaries (the CIGNA defendants) entered into an assumption agreement with Home and the other members of the AFIA, wherein it "agreed to purchase all interests in and rights to the policies and contracts that Home and the other AFIA members entered into through the AFIA pool." *Id.* at 547. The assumption agreement at issue in *Nationwide* is the same assumption agreement in this case.

Nationwide sued both Home and the CIGNA defendants, alleging that "Home and the CIGNA defendants had breached reinsurance contracts under which they were responsible for paying certain claims filed against Nationwide." *Id.* at 546. The district court referred Nationwide's claims against both Home and the CIGNA defendants to arbitration, and dismissed the entire case. *See id.* at 547. The CIGNA defendants appealed.

The primary issue on appeal was "whether the district court erred in concluding that Nationwide could bring a claim directly against the CIGNA defendants by virtue of the CIGNA defendants' assumption of the reinsurance contract between Nationwide and Home . . . ." *Id.* at 548. The appeals court concluded that Nationwide could not bring a claim directly against CIGNA. *Id.* The court interpreted disclaimer language in the assumption agreement and held that the language unequivocally:

> bars any person or entity, except the parties to the Assumption Agreement (the members of AFIA and the CIGNA defendants), from *suing* on any of the obligations undertaken pursuant to the Assumption Agreement, including the CIGNA defendants'

> obligation to make payments on the reinsurance contract between Nationwide and Home.

*Id.* (emphasis added). Despite this holding, the court acknowledged that Home's insolvency could affect "the parties' respective rights and obligations." *Id.* at 549. The court did not address this issue, however, because it concluded the issue was not ripe for review. *Id.*

Although the disclaimer language in the assumption agreement technically bars cut-through *litigation* by the AFIA Cedents, the *Nationwide* decision is silent on the issue of whether it would be permissible for the AFIA Cedents to deal directly with the ACE Companies outside of court subsequent to Home's insolvency. Moreover, the facts and circumstances have changed since *Nationwide*. Most significantly, Home is now insolvent. In light of the appeals court's decision in *Nationwide*, whether or not the AFIA Cedents can pursue cut-through litigation or deal directly with the ACE Companies is an open question.

While we conclude that the evidence supports the superior court's finding that the proposed agreement was necessary, there are also significant policy reasons that reinforce the court's decision. As noted previously, the purpose of RSA chapter 402-C is to protect preferred creditors by reserving assets for them, including people insured by Home, and people with claims against those insured by Home. *See* RSA 402-C:1, IV. RSA 402-C:1, III provides that the statute should be "liberally construed" to effectuate this purpose. Further, RSA 402-C:25 grants the liquidator broad authority to collect the assets of an insolvent insurer. A liberal construction of the statutory language supports a finding that the proposed payments to the AFIA Cedents are necessary to collect and preserve assets of Home's estate. By contrast, the ACE Companies' and BMC's reading of the statute would prevent collection of additional assets by barring payment of necessary costs.

As a final point, there is no doubt that the ACE Companies would reap a substantial windfall in the absence of the proposed agreement by depriving Home's creditors of the amounts they would have paid but for Home's insolvency. This would frustrate the legislative purpose of obtaining full payment from reinsurers despite an insurer's insolvency. *See* RSA 402-C:36; *see also* RSA 405:49, I (2006)("Reinsurance Insolvency"). Accordingly, for the foregoing reasons, we conclude that the payments to the AFIA Cedents under the proposed agreement constitute "administration costs" under RSA 402-C:44, I.

*III. Fair and Reasonable*

Finally, we address the ACE Companies' and BMC's argument that the superior court erred in concluding that the proposed agreement is fair and reasonable. First, the ACE Companies and BMC argue that the court failed to apply the controlling multi-factored standard for fairness and reasonableness. They assert that our order dated September 13, 2004, specifically directed the superior court to apply the multi-factored tests set forth in *Matter of Boston & Providence Rail Road Corp.*, 673 F.2d 11 (1st Cir. 1982), and *In re Estate of Indian Motorcycle Manufacturing, Inc.*, 299 B.R. 8 (D. Mass. 2003), *vacated in part on other grounds by* 452 F.3d 25 (1st Cir. 2006), when considering the fairness of the proposed agreement on remand. Second, they argue that proper application of the multi-factored test demonstrates that the proposed agreement is neither fair nor reasonable as a matter of law.

As the ACE Companies and BMC correctly point out, we issued an order on September 13, 2004, vacating the superior court's April 29, 2004 order in which it determined that the proposed agreement was lawful and consistent with the goals and purpose of RSA chapter 402-C. In our order, we directed the court to consider on remand whether it had an "independent obligation to assess the fairness of the agreement with the AFIA Cedents." We cited *Matter of Boston & Providence R. R. Corp.* for the proposition that, in a reorganization proceeding, a bankruptcy court must "act independently, out of its own initiative, for the benefit of all creditors" when assessing the fairness of a compromise with creditors. *Matter of Boston & Providence R. R. Corp.*, 673 F.2d at 13. We also cited *Indian Motorcycle*, which lists factors for a bankruptcy court in a Chapter 7 proceeding to consider when assessing whether a compromise with creditors is fair. *In re Estate of Indian Motorcycle Mfg., Inc.*, 299 B.R. at 20. These factors include:

(1) the probability of success in the litigation being compromised;
(2) the difficulties, if any, to be encountered in the matter of collection;
(3) the complexities of the litigation involved, and the expense, inconvenience, and delay attending it; and
(4) the paramount interest of the creditors and a proper deference to their reasonable views.

*Id.*

On remand, the superior court recognized that it had "an independent obligation to assess the fairness of the agreement with the AFIA Cedents." Thereafter, the court held an evidentiary hearing to determine

whether the terms of the agreement are fair and reasonable. Evidence presented at the five-day hearing addressed the circumstances and terms of the agreement and compromise with AFIA Cedents. After considering all of the evidence presented at the hearing, the court concluded that the proposed agreement was fair and reasonable.

The court reviewed the agreement "with the paramount interest of creditors in mind," and found that "ACE's rights as a claimant and creditor and its rights to setoff under RSA 402-C:34 are unimpaired by the pending agreement and thus the agreement is not unfair to ACE." The court found the testimony of the JPL team members to be highly credible, and gave "due deference to the business judgment of Mr. Bengelsdorf, Mr. Rosen and Mr. Hughes that it was necessary to negotiate an agreement with the AFIA Cedents to assure that the largest single asset of the estate was not lost." *See id.* at 21 ("The court may give substantial deference to the business judgment of a bankruptcy trustee when deciding whether to approve a settlement."). Further, the court found that "[u]nder the agreement the Liquidator stands to collect a portion of reinsurances otherwise at risk, for purposes of providing a direct and substantial benefit to Class II claimants, which comprise ninety (90) percent of all claimants."

■ The superior court did not precisely apply the multi-factor test outlined above. Indeed, a precise application of the *Indian Motorcycle* factors is difficult in this case because of the complex reinsurance obligations at issue. However, the court's order demonstrates consideration of the relevant factors, given the complexities of this case, and we concur with the court's decision that the agreement was fair and reasonable. First, the evidence demonstrates that the AFIA Cedents would not have filed claims against the Home estate without a financial incentive. Second, the AFIA Cedents' claims are significant, totaling approximately $231 million. The substantial dollar amount of these claims suggests that it is reasonable to assume that collection proceedings would be lengthy, complex, and difficult. Most importantly, as the superior court properly concluded, the agreement benefits the Class II claimants to Home's estate since it increases the likelihood that their claims will be paid.

Based upon the foregoing, we conclude that the superior court correctly ruled that the proposed agreement was fair and reasonable.

*Affirmed.*

BRODERICK, C.J., and DALIANIS and GALWAY, JJ., concurred.