Merrimack
No. 2006-859

### NEW HAMPSHIRE ASSOCIATION OF COUNTIES & a.

v.

### COMMISSIONER, NEW HAMPSHIRE DEPARTMENT OF HEALTH AND HUMAN SERVICES

Argued: May 23, 2007
Opinion Issued: August 17, 2007

*Devine, Millimet & Branch, PA*, of Concord (*Robert E. Dunn, Jr.* on the brief and orally), for the petitioners.

*Kelly A. Ayotte*, attorney general (*Andrew B. Livernois*, assistant attorney general, on the brief and orally), for the respondent.

BRODERICK, C.J. The respondent, Commissioner of the New Hampshire Department of Health and Human Services (commissioner), appeals an order of the Superior Court (*McHugh*, J.) denying his motion for summary judgment and granting summary judgment to the petitioners, the New Hampshire Association of Counties, five individual counties and four county commissioners. In an action for declaratory and injunctive relief, the petitioners claimed that the commissioner violated Part I, Article 28-a of the State Constitution by: (1) requiring the counties to pay a share of the cost of providing Medicaid-funded long-term care to recipients of old age assistance (OAA) and assistance for the permanently and totally disabled (APTD) who received services in facilities not licensed by the State as residential care facilities; and (2) billing the counties, in fiscal year 2004, in excess of the amount allowed by statute. We affirm in part, vacate in part and remand.

I

The record supports the following. Since 1999, pursuant to RSA 167:18-b (Supp. 2006), the department of health and human services (DHHS) has billed each county for a share of the cost of providing OAA and APTD recipients with two kinds of Medicaid-funded long-term care: (1) nursing facility services, *see* RSA 167:18-b, I; 42 U.S.C.A. §§ 1396d(a)(4)(A), 1396d(f), 1396r (West 2003 & Supp. 2007); and (2) home and community-based nursing services provided under a Medicaid waiver program, *see* RSA 167:18-b, II; 42 U.S.C.A. § 1396n(b)-(d) (West 2003 & Supp. 2007); 42 C.F.R. §§ 441.350 *et seq.* (2006). In May, November and December 2002, DHHS sent the counties a series of supplemental bills, which are at the heart of this dispute. With those bills, DHHS sought to recover half of the non-federal share of the cost of providing Medicaid-funded long-term "skilled care," in facilities that DHHS does not categorize as "nursing homes," to OAA and APTD recipients who had not previously received either nursing facility services or home and community-based nursing services.

According to the commissioner, all of the disputed billings were for patients who received "nursing facility services," regardless of the State licensure classification of the facilities in which they received those services. The counties describe the subjects of the disputed billings as "over 100 Medicaid recipients who apparently were receiving certain types of skilled care services *but who had not been in a nursing home or in [home or community-based care].*" For its part, the trial court referred to the "disputed category of recipients," but recited no facts concerning the nature of the services the disputed category of recipients had received. However, in a section heading, the trial court characterized the disputed

billings as being for "[l]ong-term Medicaid costs," which at least suggests a finding that the disputed billings were for what the Medicaid statute refers to as "nursing facility services." *See* 42 U.S.C.A. § 1396d(a)(4)(A), (f).

DHHS has continued to bill the counties for the services provided to the disputed category of recipients on a monthly basis. Six counties initially paid the bills, but eventually stopped doing so. One county paid for a longer time, but has since stopped. The remaining three counties received none of the disputed billings until recently.

More than half of the OAA and APTD recipients for whose care DHHS sought reimbursement received services at Crotched Mountain Rehabilitation Center (Crotched Mountain). The remaining recipients received services either in hospitals in New Hampshire or in out-of-state facilities. Both sides treat Crotched Mountain as an exemplar for all the disputed facilities. In a document titled "HEALTH FACILITY CATEGORY CODES," the DHHS bureau of health facilities administration (bureau) placed Crotched Mountain in the "special hospital—rehabilitation" category rather than the category labeled "nursing." Both sides appear to assume, although the record does not demonstrate, that the bureau's health facility categories are based upon the statutory licensure classifications. A "bed need report" prepared in 2005 by the DHHS division of public health services shows that there are no nursing home beds in Greenfield, the town where Crotched Mountain is located. In addition, Crotched Mountain does not pay the nursing facility quality assessment, a fee imposed by statute upon "all nursing facilities." *See* RSA 84-C:2 (Supp. 2006). On the other hand, DHHS asserts, without direct evidence in the summary judgment record, that Crotched Mountain is certified by the federal government to provide nursing facility services for Medicaid recipients. However, as both sides agree that their dispute concerns responsibility for the non-federal share of the cost of providing care to OAA and APTD recipients receiving Medicaid-funded services in Crotched Mountain and other facilities, it seems beyond reasonable dispute that Medicaid has agreed to pay the federal share, and would not have done so for recipients in facilities that it had not certified in some manner.

In 2004, the amount DHHS was allowed to bill the counties for nursing facility services and home and community-based nursing services for OAA and APTD recipients was capped, by statute, at $60 million. *See* RSA 167:18-b, IV(a). DHHS submitted bills to the counties in the amount of $62,109,886.56 for 2004, but provided them a credit of $2,109,886.56, thus lowering the amount it sought to collect to exactly $60 million. The "counties have [all] refused to pay bills for the excess amount over the cap of $2,109,8[8]6.56."

Asserting that billings for OAA and APTD recipients who were not in "nursing homes" or receiving home and community-based nursing services and billings in excess of $60 million for fiscal year 2004 were both unfunded mandates within the meaning of Part I, Article 28-a of the State Constitution, and therefore unconstitutional, the New Hampshire Association of Counties and several individual counties filed an equitable action against the commissioner. As a remedy for their first claim, the petitioners sought an order that would: (1) prohibit DHHS from billing the counties for services provided in the disputed facilities; and (2) require DHHS to give the counties that actually reimbursed DHHS for those services a credit against future payments.

The petitioners moved for summary judgment. In an objection to the petitioners' summary judgment motion, the commissioner argued that "even assuming *arguendo* that the Counties are correct in their contention that they have been improperly billed for the amount of the disputed funds pursuant to RSA 167:18-b, those bills are permissible under the broader provisions of RSA 167:18-a." The commissioner also moved for summary judgment, arguing that the petitioners' entire action was barred by the doctrine of sovereign immunity and that the credit they sought was barred by sovereign immunity. In the order from which the commissioner appeals, the trial court ruled that: (1) as a constitutional claim, the petitioners' action was not barred by sovereign immunity; (2) because the credit the petitioners sought constituted equitable relief rather than money damages, it was not barred by sovereign immunity; (3) the counties were not obligated to pay for the disputed services pursuant to RSA 167:18-a; (4) the commissioner violated Part I, Article 28-a of the State Constitution by billing the counties for services falling outside the scope of RSA 167:18-b, I; and (5) the commissioner violated Part I, Article 28-a of the State Constitution by billing the counties more than the amount allowed by RSA 167:18-b, IV(a). With regard to RSA 167:18-b, I, the trial court ruled:

> Because the Department does not dispute that the institutions at issue in this case are not and have never been licensed as nursing homes or nursing facilities in the State of New Hampshire, and because the Department does not dispute that the institutions at issue have not paid a nursing facility quality assessment as required of all nursing facilities under RSA 84-C:2, the Court finds these institutions are not nursing homes or facilities under the language of RSA 167:18-b.

This appeal followed.

## II

In reviewing the trial court's summary judgment rulings, we consider the evidence in the light most favorable to each party in its capacity as the non-moving party and, if no genuine issue of material fact exists, we determine whether the moving party is entitled to judgment as a matter of law. *N.H. Ins. Guaranty Assoc. v. Elliot Hosp.*, 154 N.H. 571, 574 (2006).

The commissioner raises four issues on appeal, three related to the merits, one related to sovereign immunity. Regarding the merits, the commissioner contends that the trial court erred by ruling that: (1) RSA 167:18-b, I, bars DHHS from billing the counties for services provided to OAA and APTD recipients in facilities other than nursing homes licensed by the State; (2) RSA 167:18-a applies only to cash payments to OAA and APTD recipients; and (3) the cap on billings in RSA 167:18-b, IV(a) refers to the gross amount DHHS bills the counties rather than the net amount it seeks to recover from them. In addition, the commissioner contends that the trial court erred by ruling that sovereign immunity does not preclude the relief it granted in this case, a credit against future DHHS billings. The commissioner does not challenge, and we do not consider, the trial court's determination that because this action is a constitutional claim, it is not barred by the doctrine of sovereign immunity.

## III

In their motion for summary judgment, the petitioners argued that the commissioner imposed an unconstitutional unfunded mandate upon the counties when DHHS billed them for a share of the cost of services provided to OAA and APTD recipients in facilities such as Crotched Mountain because RSA 167:18-b, I, only authorizes the State to seek reimbursement for services provided to OAA and APTD recipients in State-licensed nursing facilities. The trial court agreed. In doing so, it construed the term "nursing homes" in RSA 167:18-b, I, to mean facilities that are licensed by the State as nursing facilities and that pay the nursing facility quality assessment, *see* RSA 84-C:2. More specifically, the trial court found "it logical that the terms 'nursing home' and 'nursing facility' were used within RSA 167:18-b to denote those facilities licensed as 'nursing home[s] or facility[ies]' by the State under RSA 151-C:4." The commissioner argues that the trial court construed RSA 167:18-b, I, too narrowly, and that the term "nursing home" should be construed to mean any facility that is certified as a nursing facility by the federal Medicaid program. The commissioner further contends that if the trial court had construed the term "nursing home" correctly, it would have determined that the federal certification status of Crotched Mountain and the other

disputed facilities presented a genuine issue of material fact that precluded summary judgment.

We begin by noting that the commissioner does not challenge the trial court's determination that the DHHS billing decisions at issue were "mandates" within the meaning of Part I, Article 28-a of the State Constitution, and so we express no opinion on that aspect of the trial court's ruling. Rather, the commissioner argues that: (1) the trial court misconstrued the term "nursing home" in RSA 167:18-b, I; (2) under a proper construction of that term, DHHS did not violate the statute; and (3) absent a statutory violation, there was, necessarily, no constitutional violation.

We limit ourselves to construing the relevant statutory language, which provides, in pertinent part:

> All expenditures in carrying out the purposes of this chapter ... relative to old age assistance or aid to the permanently and totally disabled *recipients who are in nursing homes* shall be made in the first instance from the public assistance fund hereby created, but each county shall make monthly payments to the state for the amounts due under this section within 45 days from notice thereof and shall reimburse said fund for all assistance granted to persons for which such county is liable, to the extent of 50 percent of the non-federal share ....

RSA 167:18-b, I (emphasis added).

The interpretation of a statute is a question of law, which we review *de novo. In the Matter of Liquidation of Home Ins. Co.*, 154 N.H. 472, 479 (2006). We are the final arbiters of the legislature's intent, as expressed in the words of the statute considered as a whole. *Id.* We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meanings to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.* However, if a statute is ambiguous, we consider the legislative history to aid our analysis. *Cloutier v. City of Berlin*, 154 N.H. 13, 17 (2006). Our goal is to apply statutes in light of the legislature's intent in enacting them, and in light of the policy sought to be advanced by the entire statutory scheme. *Id.* Moreover, we consider all statutes concerning the same subject matter in interpreting any one of them and, where reasonably possible, we construe statutes as consistent with each other. *In the Matter of Barrett & Coyne*, 150 N.H. 520, 523 (2004).

The question of statutory construction we face is what did the legislature intend by using the phrase "recipients who are in nursing homes" in RSA 167:18-b, I. The commissioner contends that RSA 167:18-b, I, was adopted with the federal Medicaid program in mind and that, as a consequence, the legislature intended the phrase "recipients who are in nursing homes" to denote OAA and APTD recipients who are in facilities certified by the federal Medicaid program as nursing facilities. The petitioners, on the other hand, ask us to limit the phrase to recipients who are in State-licensed nursing homes, see RSA 151:2, I(e) (2005), that pay the nursing facility quality assessment, see RSA ch. 84-C (Supp. 2006). Because both interpretations are reasonable, RSA 167:18-b, I, contains an ambiguity that requires us to look beyond the statute itself to determine its meaning. In the Matter of Baker & Winkler, 154 N.H. 186, 187 (2006).

As a preliminary matter, we note that, notwithstanding the petitioners' suggestion to the contrary, DHHS has not licensed *any* facilities *as nursing homes*, because there is no statutory licensure classification for nursing homes *per se*. RSA 151:2, I, requires licensing for six classifications of health facilities: (1) hospitals and infirmaries or health services maintained by educational institutions; (2) home health care providers; (3) certain laboratories or collection stations operated by laboratories; (4) "[f]acilities ... operating as an outpatient rehabilitation clinic, ambulatory surgical center, hospice, emergency medical care center, drop-in or walk-in care center, dialysis center, birthing center, or other entity where health care associated with illness, injury deformity, infirmity, or other physical disability is provided"; (5) residential care facilities; and (6) adult day care facilities. With regard to "residential care facilities," the statute provides that "[s]uch homes or facilities shall include, but not be limited to, nursing homes, sheltered care facilities, rest homes, residential care facilities, board and care homes, or any other location, however named, whether owned publicly or privately or operated for profit or not." RSA 151:2, I(e). But while "nursing home" is listed as a kind of facility that qualifies as a "residential care facility," it is not accurate to say that any particular facility is licensed *as a nursing home*; under the statute, nursing homes, along with a variety of other kinds of facilities, are licensed as residential care facilities. We understand that a bureau of health facilities administration listing of "health facility category codes" includes a separate code labeled "nursing," but that administrative categorization is insufficient to make "nursing home" a separate statutory licensure classification. Accordingly, we decline the petitioners' request to define the term "nursing homes" to include only facilities licensed by the State as nursing homes, because there simply is no such statutory classification of licensure.

As the petitioners acknowledge, RSA 167:18-b does not define the term "nursing home." That is not to say, however, that the legislature has never done so. To the contrary, in 1969, the legislature adopted two different definitions of "nursing home." In "An Act Relative to Hospital Licensing," the legislature defined "'[n]ursing [h]ome' [to] mean[] any facility subject to license *hereunder* which is maintained and operated for the express purpose of providing continuing nursing care for more than ten persons." Laws 1969, 379:2 (emphasis added), *repealed by* Laws 1979, 399:3. Because chapter 379 did nothing other than amend RSA chapter 151 (1964), the term "hereunder" must, necessarily, refer to a facility subject to license under RSA chapter 151. Also during the 1969 legislative session, in "An Act Relative to the Licensing and Registration of Nursing Home Administrators," the legislature defined "'[n]ursing home' [to] mean[] any institution or facility, whether proprietary or non-proprietary, defined as a nursing home for licensing purposes pursuant to RSA 151, *or the equivalent facility or facilities as defined by the secretary of the United States Department of Heath, Education and Welfare.*" Laws 1969, 459:1 (emphasis added). While the former definition was eventually repealed, both were in effect in 1973 when the provision now denominated as RSA 167:18-b, I, was first adopted, and both support the commissioner's position.

For its part, the trial court pointed to a definition of "nursing home or facility" from the statute establishing the certificate of need process, *see* RSA 151-C:2, XXVI (2005), and found it logical to interpret RSA 167:18-b, I, in light of the requirements set out in RSA 151-C:4. However, unlike either of the two definitions from 1969, the definition of "nursing home or facility" in RSA 151-C:2, XXVI—which was first adopted in 1985 and subsequently amended in 1995—is silent with regard to licensing. Consequently, it is of little assistance in answering the question before us. Similarly unavailing is the petitioners' reliance upon the fact that Crotched Mountain does not pay the nursing facility quality assessment; RSA chapter 84:C, which imposes that fee, was enacted in 2003, which demonstrates that payment of the assessment established by that statute could not have played any part in the legislature's understanding of the term "nursing home" in 1973. Accordingly, we turn to the two statutory definitions of "nursing home" that were in effect in 1973, when the legislature first used the phrase "recipients who are in nursing homes" in RSA 167:18-b, I.

The definition from chapter 379 provided that a nursing home was, among other things, a facility subject to license under RSA chapter 151. Chapter 379 did *not* require a nursing home to be subject to license *as a residential care facility,* only that it be subject to license under the

general hospital licensing statute. That is because, unlike today, when RSA 151:2, I, specifically identifies six classifications of facilities that require licensure and establishes licensing fees based upon those classifications, *see* RSA 151:5 (2005), the version of RSA chapter 151 in force in 1973 had only a single licensure classification. It required licensing of any "hospital or other institution, building, residence, private home, or other place or part thereof, however named" that provided certain services. RSA 151:2 (1977). It also did not include a classification-specific schedule of licensing fees. In other words, when RSA 167:18-b, I, was first adopted, there was no licensure classification for residential care facilities, much less a classification for nursing homes. Thus, there is no evidence supporting an inference that the legislature intended to limit the term "nursing homes" in RSA 167:18-b, I, to those facilities licensed by the State as residential care facilities or nursing homes. Because there was no separate statutory licensure classification for nursing homes in 1973, when RSA 167:18-b, I, was first adopted, the definition of "nursing home" in chapter 379 does not support the limitation the petitioners ask us to impose upon that term.

The definition from chapter 459 favors the commissioner's position even more strongly. That definition of "nursing home" includes both facilities defined as nursing homes for the purposes of State licensing and "the equivalent ... facilities as defined by the secretary of the United States Department of Health, Education and Welfare." Laws 1969, 459:1. As early as 1969, four years before the initial adoption of RSA 167:18-b, I, the legislature recognized that the federal government had an interest in and procedures for evaluating nursing facilities.

Finally, we turn to the context in which the legislature used the term "nursing home" in RSA 167:18-b, I. *See Home Insurance*, 154 N.H. at 479. The legislature must be presumed to have been aware of the statutory licensing regime for health care facilities, yet it did not use the phrase "State licensed nursing homes." To be sure, it also did not use the phrase "federally certified nursing homes," but within RSA 167:18-b, I, itself, the legislature plainly recognized federal participation in funding the services at issue. On balance, the wording of RSA 167:18-b, I, as a whole favors a construction of the term "nursing home" based upon federal certification standards rather than State licensure.

■ In light of the two statutory definitions of "nursing home" in force when the legislature used the term "nursing home" in RSA 167:18-b, I, our obligation to construe statutes in the context of the overall statutory scheme, *see N.H. Ins. Guaranty Assoc.*, 154 N.H. at 574, and our obligation to construe statutory language in the context of the statute as a whole, *see Home Insurance*, 154 N.H. at 479, we conclude that the

legislature did not intend, by using the term "nursing home," to limit the applicability of RSA 167:18-b, I, to OAA and APTD recipients in institutions licensed by DHHS as residential care facilities.

Our conclusion is further supported by subsequent legislative enactments that continue the pattern of State recognition of, and reliance upon, federal certification of nursing homes. For example, the statute pertaining to the obligation of residential care facilities to evaluate the needs of their residents defers to federal standards when facilities are certified under Titles XVIII and XIX of the Social Security Act. *See* RSA 151:5-a, I (Supp. 2006). And under RSA 151:5-b (2005), facilities certified under Titles XVIII and XIX are "deemed licensed" and are exempt from annual inspections.

■■■ Based upon the foregoing, we hold that the term "nursing home" in RSA 167:18-b, I, means any institution certified by the federal Medicaid program to provide nursing facility services. But that is not the end of the matter. Under Title XIX, it is possible for facilities providing inpatient hospital services also to provide nursing facility services, *see* 42 U.S.C.A. §§ 1396*l*, 1396r(a) (West 2003), which raises the specter of the counties being billed, under RSA 167:18-b, I, for services other than nursing facility services, such as inpatient hospital services. However, when nursing facility services are provided in hospitals, the costs for such services must be in line with the rates paid for similar services at nursing facilities. *See* 42 U.S.C.A. § 1396*l*. Thus, defining the term "nursing home" to include facilities such as Crotched Mountain does not mean that the counties will be obligated to pay half the non-federal share of inpatient hospital services, *see* 42 U.S.C.A. § 1396d(a)(1) (West 2003 & Supp. 2007), but only half the non-federal share of nursing facility services provided in Crotched Mountain and the other facilities housing OAA and APTD recipients for whom the counties were billed. To make that point perfectly clear, we construe the phrase "recipients who are in nursing homes" to mean OAA and APTD recipients receiving Medicaid-funded nursing facility services in institutions certified by the Medicaid program to provide such services. To the extent the trial court construed that phrase differently, its order is vacated.

■ Based upon our construction of "recipients who are in nursing homes," the petitioners are not entitled to judgment as a matter of law that DHHS exceeded its statutory authority by issuing the disputed billings. Accordingly, the trial court's grant of summary judgment to the petitioners on their claim that the DHHS billings violated the State Constitution by violating RSA 167:18-b, I, is vacated. Necessarily, the remedy awarded the counties is also vacated.

Because, at this point, the counties are not entitled to any remedy on the claim that they were billed unlawfully, we decline to determine whether the remedy imposed by the trial court—a credit against future billings—violates the doctrine of sovereign immunity.

IV

In his supplemental objection to the petitioners' motion for summary judgment, the commissioner argued that even if the counties were not liable for half the non-federal share of the cost of the disputed services under RSA 167:18-b, I, they were liable for half the costs of those services under RSA 167:18-a. Notwithstanding the untimely presentation of that argument, the trial court considered but rejected it, ruling, among other things, that RSA 167:18-a pertains not to reimbursement for medical services but to reimbursement for cash payments to OAA and APTD recipients.

Based upon our construction of the phrase "recipients who are in nursing homes," the only services that would fall outside the coverage of RSA 167:18-b, thus falling within the commissioner's "even if," would be medical services that do not qualify as nursing facility services and/or services provided in facilities not certified by the federal government to provide nursing facility services. Because the summary judgment record does not indicate that the counties have been billed for any such services, we decline to address the commissioner's argument regarding RSA 167:18-a.

V

In their motion for summary judgment, the petitioners argued that the commissioner imposed an unconstitutional unfunded mandate upon the counties when DHHS billed them $62,109,886.56 for fiscal year 2004, which was $2,109,886.56 more than the $60 million cap established by RSA 167:18-b, IV(a). The trial court agreed, and further ruled that the counties were within their rights when they declined to pay any of the disputed $2,109,886.56. The commissioner argues that to the extent the trial court construed the term "billings" to mean the gross amount billed, before the application of any offsets, credits or adjustments, it erred. According to the commissioner, such a reading of the statute would lead to an absurd result because it would allow erroneous bills to be counted toward the cap, and would allow for double counting when a corrected bill was sent out to replace an erroneous one. In addition, while the commissioner now concedes that the $2 million credit established by RSA 167:18-b, III reduced the cap on the counties' actual 2004 payment obligation to $58 million, he contends that the trial court's ruling was erroneous because the

petitioners never presented any evidence, and the trial court never made any findings, regarding how much the counties were actually obligated to pay in 2004.

The statutory provisions limiting county liability for reimbursing DHHS for nursing services provide, in pertinent part:

> III. The counties shall have an aggregate credit of $2,000,000 against amounts due under this section for each fiscal year beginning July 1, 1998. . . . The credit under this paragraph shall reduce the obligation of the counties under paragraph IV.
>
> IV. The total billings by all counties made pursuant to this section for persons who have been determined eligible to receive nursing facility services shall not exceed 50 percent of the non-federal share of the combined long-term care medicaid spending for which the counties are obligated and in no instance shall the billings for the 12-month period of the state fiscal year, dated between July 1, 2004 and June 30, 2007 exceed:
>
> (a) State fiscal year 2004—$60,000,000.

RSA 167:18-b.

As with his challenge to the trial court's ruling regarding RSA 167:18-b, I, the commissioner does not contest the trial court's determination that a billing in excess of the amount allowed by RSA 167:18-b, IV(a) would be an unconstitutional unfunded mandate. Therefore, we again express no opinion regarding that aspect of the trial court's ruling but, instead, confine ourselves to the statutory arguments raised by the parties.

Regarding the interplay between RSA 167:18-b, III and RSA 167:18-b, IV(a), there appears to be no disagreement; both sides agree that RSA 167:18-b, III reduced the counties' aggregate 2004 reimbursement obligation from $60 million to $58 million. We affirm the trial court's ruling to that effect.

We reach a different result with regard to the trial court's determination that the counties were within their rights not to pay any of the disputed $2,109,886.56. It is undisputed that DHHS submitted bills to the counties totaling $62,109,886.56 for 2004 and that the counties refused to pay $2,109,886.56. However, the record does not indicate how much the counties actually did reimburse DHHS for 2004, and there still remains a legal issue: whether the term "billings" applies only to gross billings, before any credits, offsets, or adjustments are made. The commissioner concedes that it is unclear whether the trial court reached such a legal conclusion, but asks us to determine that if it did so, it erred. We will not pass upon a legal ruling that may or may not have been made by the trial

court, but we encourage the trial court, upon remand, to address this issue to the extent necessary.

*Affirmed in part; vacated in part; and remanded.*

DALIANIS, DUGGAN, GALWAY and HICKS, JJ., concurred.