2015 VT 4

**In re Ambassador Insurance Company, Inc.**
**(National Indemnity Company, Appellant)**

[114 A.3d 492]

No. 13-184

Present: **Reiber, C.J., Dooley, Skoglund and Robinson, JJ., and Morris, Supr. J. (Ret.), Specially Assigned**

Opinion Filed January 23, 2015

*Andre D. Bouffard* of *Downs Rachlin Martin PLLC*, Burlington, for Appellant.

*Jacqueline A. Hughes* and *Daniel C. Burke* of *Storrow Buckley Hughes, LLP*, and *David R. Cassetty*, Special Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Robinson, J.** This appeal arises from the liquidation of Ambassador Insurance Company, Inc., a property and casualty insurance company incorporated in Vermont. Appellant National Indemnity Company (NICO), assignee to two claims under excess liability policies issued by Ambassador, appeals a superior court order setting a deadline by which all policyholders must file final proofs of claim. NICO argues that the court's deadline is unreasonable and that the court failed to consider available alternatives to a final claim date. We reverse.

## I.

### a. Ambassador's Liquidation

¶ 2. The material facts as of the time of the October 2012 superior court hearing in this matter are undisputed. This is the fourth appeal to this Court involving the liquidation of Ambassador, an insurance company. Ambassador was incorporated and domiciled in Vermont with a principal place of business in New Jersey. It acted as a surplus-lines insurer, insuring high-risk commercial entities and individuals who were unable to obtain insurance from a licensed insurer. In November 1983, the superior court placed Ambassador, which by that time was in a "hazardous financial condition," into receivership. *In re Ambassador Ins. Co.*, 147 Vt. 344, 345, 515 A.2d 1074, 1075 (1986) (*Ambassador I*). The receiver, the commissioner of the Department of Banking and

Insurance,[1] discovered the company had grossly underfunded its liability reserves, failed to keep track of policy transactions and cancellations, lost its reinsurance coverage, and was insolvent by at least $43 million using statutory accounting methods, and at least $25 million using less conservative liquidated-value accounting principles.[2] *Id.* at 345, 515 A.2d at 1076. Concluding that Ambassador could not be rehabilitated, the superior court ordered liquidation. *Id.* at 346, 515 A.2d at 1076. On appeal, this Court affirmed the decision to liquidate. *Id.* at 349, 515 A.2d at 1078.

¶ 3. In 1987, following the appeal to this Court, the superior court issued a liquidation order. The liquidation order provides standards and processes for administering the liquidation estate, including the process for making distributions to Ambassador's creditors. The order set a deadline of March 1, 1988 for filing claims and accompanying proofs of loss. In addition to providing for the filing of actual known claims, the order allowed claimants to file potential claims based on circumstances within a claimant's knowledge reasonably expected to give rise to claims. The order also provided for policyholder-protection claims that allowed policyholders to preserve the right to assert claims against Ambassador in the future even if the policyholder did not know or have reason to know of the existence of an actual or potential claim at that time.

¶ 4. Distribution under the order is controlled by a since-repealed provision in Vermont law relating to liquidation of insolvent insurance companies, 8 V.S.A. § 3595 (repealed 1991), providing for five levels of priority in distribution to unsecured creditors. The first three levels include administration expenses, employee compensation, and certain taxes and debts. *Id.* § 3595(b). The fourth priority level is reserved for claims arising under insurance policies and contracts. *Id.* The fifth priority level encompasses all other claims. *Id.*

¶ 5. In the course of the liquidation process, the liquidator, who was appointed by the commissioner,[3] recovered $104 million in reinsurance coverage, in addition to other miscellaneous recover-

---

[1] The department subsequently became the Department of Banking, Insurance, Securities and Health Care Administration (BISHCA), and in 2012 became the Department of Financial Regulation.

[2] By the time the court ordered liquidation in 1984, the liquidated-value figure had risen to $42.5 million. *Ambassador I*, 147 Vt. at 345, 515 A.2d at 1076.

[3] We refer to both the commissioner acting in her capacity as liquidator and the individual appointed by the commissioner to act as liquidator as "the liquidator."

ies. The liquidator also secured a judgment against Ambassador's auditor for professional malpractice. See *Thabault v. Chait*, 541 F.3d 512, 515-18 (3d Cir. 2008). On the basis of this judgment, in 2008, the liquidator recovered $205 million for Ambassador. The new infusion of funds in 2008 allowed Ambassador to pay in full priority-four policyholders who had previously received only partial distributions, bringing the total paid to claimants to approximately $347 million. As of May 2012, all court-approved priority-four claims had been paid in full, with interest.

¶ 6. Ambassador now has nearly $92 million in assets. The liquidator estimates that Ambassador has $26 million in known unsatisfied obligations to priority-four claimants remaining.[4] This figure does not include $20 million in claims by NICO that are the subject of ongoing litigation, as discussed below.

¶ 7. The remaining unliquidated priority-four claims against the Ambassador estate involve asbestos and environmental policies. The liquidator testified that Ambassador has received specific claim information for some, but not all, claims made under previously filed policyholder-protection claims and that almost all of these claims are for unstated value. Ambassador currently has 185 open claim files for actual unliquidated priority-four claims, as contrasted with policyholder-protection claims for unknown future claims. Many of the open claims files comprise multiple specific claims. The collective policy limits on these claims that have been asserted but not yet liquidated total approximately $160 million. Ambassador's reserves for these claims are approximately $18 million. This sum represents the liquidator's professional judgment about the amount of reserves to assign to those liabilities. In addition, the liquidator estimates that the amount of unknown, unasserted potential future claims is around $13 million.[5]

¶ 8. As of May 2012, Ambassador had $32 million in court-approved priority-five claims.[6] The liquidation order provides that

---

[4] This figure is net of reinsurance recoveries available to cover certain liabilities.

[5] This type of claim is sometimes described as "incurred but not reported" (IBNR).

[6] In its brief and at oral argument, the Department of Financial Regulation represented that the priority-five claims total approximately $32 million. In his testimony below, the liquidator testified that the priority-five claims consisted of a $32 million claim on a reinsurance policy, and an additional $5 million in obligations to lawyers, adjusters, and others incurred before the receivership. The discrepancy does not substantially affect our analysis.

priority-five claims cannot be paid until all priority-four claims have been paid, with interest.

### b. NICO's Claims Against Ambassador

¶ 9. Prior to the initiation of these liquidation proceedings, Ambassador issued two occurrence-based excess liability policies to A.P. Green Industries, Inc. for successive policy years, covering the period from December 1982 to June 1984. The policies insured A.P. Green against business-related losses, and each policy provided $10 million of excess coverage in A.P. Green's fourth layer of coverage. In other words, Ambassador's policies would provide additional coverage if the approximately $26 million of coverage in A.P. Green's underlying three layers of insurance was exhausted. A.P. Green was in the business of manufacturing, distributing, and installing products containing asbestos.

¶ 10. In the early 1980s, a number of plaintiffs began filing tort actions against A.P. Green alleging injury from asbestos exposure. Although it did not originally appear that Ambassador's layer of excess coverage would be implicated by such claims, A.P. Green filed a proof-of-claim in the Ambassador liquidation proceeding for policyholder-protection on both of its Ambassador policies.

¶ 11. A.P. Green came into financial difficulty as asbestos-related claims continued to mount against it in the 1990s. By 2001, it appeared that Ambassador's layer of coverage for A.P. Green might be implicated. At that point, A.P. Green had settled about 200,000 asbestos-related claims, totaling approximately $446 million. It had unfunded settlements and judgments in 49,500 asbestos-related claims, of approximately $492 million, and another 235,000 pending asbestos-related claims.

¶ 12. In 2001, A.P. Green assigned its claims against Ambassador to NICO in exchange for $1 million immediate cash. As part of the assignment, NICO agreed to pay A.P. Green half of any amount recovered over $3 million, after expenses. Following the assignment, NICO submitted a claim to liquidator for $20 million — the full amount available under the two policies.

¶ 13. In 2002, A.P. Green filed for Chapter 11 bankruptcy. Since the commencement of A.P. Green's bankruptcy, all asbestos claims were stayed and funneled into two asbestos trusts. NICO has represented that as of September 2012 A.P. Green's plans for reorganization were in the final stages of confirmation. The proposed reorganization plan provides for payment of liquidated

but unpaid claims as well as review, determination, and payment of unliquidated claims. Because of A.P. Green's bankruptcy and the stay on the asbestos claims against A.P. Green, many of those claims have not yet been adjudicated or settled. As a consequence, the full extent of A.P. Green's liability to claimants for exposures during the period of the Ambassador policies remains undetermined.

¶ 14. Following A.P. Green's assignment of its claims to NICO, NICO sought payment for the $20 million policy limits of the liability coverage from Ambassador, claiming that the three underlying layers of A.P. Green's excess coverage had been exhausted. After a dispute about the priority level of NICO's claims, this Court concluded that NICO's claims, as assignee, are fourth-priority policyholder claims. *In re Ambassador Ins. Co.*, 2008 VT 105, ¶ 24, 184 Vt. 408, 965 A.2d 486. As of the time of the superior court hearing on the present issue, the liquidator and NICO were litigating these claims.

### c. Final Claim Date

¶ 15. At a status conference in May 2010 regarding Ambassador's ongoing liquidation, the superior court requested that the liquidator prepare a report detailing a possible procedure for bringing the liquidation to a close. In response, Ambassador's liquidator filed a motion with the superior court to establish a deadline by which all claimants, including those who previously filed policyholder-protection claims, would need to file final and complete proofs of claim. In his motion, the liquidator argued that the 1987 liquidation order, Vermont's statutory scheme for liquidation, and precedents from other jurisdictions support the establishment of a final claim date. These authorities, he contended, favor expeditious completion of the liquidation and supported the liquidator's discretion and authority to determine when it is appropriate to "cut off claims that still are not absolute in favor of final distribution to those with fixed claims." The liquidator further argued that a final claim date was appropriate in this case because without it, the liquidation would go on indefinitely, Ambassador's total liability to priority-four claimants would never be known, and priority-five claimants with absolute claims could not be paid.

¶ 16. Notice of the liquidator's motion was sent to approximately 80,000 interested parties, including policyholders, potential claim-

ants, insurance commissioners throughout the U.S., and guaranty funds. Notice was also published in newspapers of both national and local circulation. NICO and A.P. Green filed one of four objections with the superior court.[7] The Ambassador insureds who objected to the establishment of a final claim date argued first that the court lacked statutory authority to set a bar date for claims. They argued that setting such a date would favor priority-five claimants at the expense of priority-four claimants whose claims could not yet be liquidated, and even if the court had authority to set such a date, setting it too soon would unreasonably limit claimants' ability to submit proof of their claims.

¶ 17. In November 2012, the superior court issued an order setting December 31, 2013 as the deadline by which any policyholder, including insureds who had asserted policyholder-protection claims, would be required to submit a final proof of claim complying with the more stringent requirements for an actual proof of claim. The court concluded that it had authority to set a final claim date, explaining that just as the court had discretion to approve distributions and to establish a policyholder-protection process, which was not otherwise provided for by the liquidation statute, so too did it have the authority to bring that process to a close. Moreover, it noted that the existence of priority-five claims implies that there must be some process for closing priority-four claims so that priority-five claimants can be paid.

¶ 18. Having concluded that it had the authority to do so, the court proceeded to set a deadline approximately one year from the date of the order. The court offered three reasons for its selection of the December 31, 2013 deadline — approximately thirteen months from the date of the court's order. First, it noted that several of the policyholders who objected to the bar date represented that their claims were close to some impending event that would bring the claims into sharper focus. The court's expressed intention was "to open the insolvent estate to as many legitimate claims as possible." It reasoned that one year would

---

[7] Ambassador policyholders C.P. Chemicals, Phibro-Tech, Inc. and Phibro Animal Health Corp. also filed objections to the liquidator's motion for a final claim date. They argued that a final claim date would prejudice their claims, which are currently being disputed or awaiting regulatory action. These policyholders do not appeal the superior court order; NICO is the only original objector that appealed the superior court's order.

provide sufficient time for the investigation and negotiation of claims that were known but not yet fully developed. Second, the court noted that one year should provide sufficient time for any appellate review of the bar date.[8] Third, the court noted that a more accelerated final claim date would be inappropriate in light of the ongoing litigation over whether A.P. Green's underlying layers of coverage had been exhausted. NICO appealed to this Court.

## II.

¶ 19. We first address the reasonableness of the final claim date set by the superior court. On appeal, NICO argues that the final claim date does not strike a reasonable balance between the need to wind up the liquidation and the rights of policyholders with unliquidated claims. NICO contends that because Ambassador is now solvent, the liquidator can continue to cover all costs of administration in addition to paying claims and immediate closure of the liquidation is therefore not warranted. Closure at this time, NICO argues, would deny payment to higher-priority creditors in favor of lower-priority creditors, contrary to the policy in insolvency proceedings of protecting the rights of policyholders.

¶ 20. Ambassador argues that the court has discretion to set a final claim date and the court did not abuse that discretion because it considered the competing equitable factors in this case, including the length of the liquidation and the distributions already made to thousands of policyholders. Overall, Ambassador argues, the balance between expeditious completion of this lengthy liquidation and protection of unliquidated claims favors closure of the liquidation proceeding.

¶ 21. ■■ The primary issue on appeal is not whether the trial court had the legal authority to set a final claim date.[9] Nor is it

---

[8] This prediction proved to be incorrect.

[9] We agree with the trial court that a court supervising the liquidation of an insolvent insurer has the authority to set a reasonable deadline for filing final proofs of claim as long as that deadline is not in conflict with any statutory requirements. None of the parties dispute this conclusion on appeal, and it is supported by case law from other states. See, e.g., *MSEJ, LLC v. Transit Cas. Co.*, 280 S.W.3d 621, 624 (Mo. 2009) (recognizing that Missouri statute empowers court to "set reasonable time standards for the resolution of a receivership"); *Lorain Cnty. Bd. of Comm'rs v. U.S. Fire Ins. Co.*, 610 N.E.2d 1061, 1064 (Ohio Ct. App. 1992) ("It is commonly accepted that upon the liquidation of an insolvent insurer,

whether the liquidation estate should remain open forever, with no deadline for presenting liquidated claims. Rather, the question is whether, given the unique circumstances of this case, the trial court erred in setting December 31, 2013 as a final date for submission of proofs of liquidated claims. In *Ambassador I*, we recognized that the trial court has broad discretion to determine whether liquidation of an insolvent company is necessary. 147 Vt. at 346-47, 515 A.2d at 1076. It is also commonly accepted that the liquidator has discretion in administering an insolvent estate, subject to the limitations in the liquidation statute. See *In re Exec. Life Ins. Co.*, 38 Cal. Rptr. 2d 453, 459 (Ct. App. 1995) (stating commissioner is "vested with broad discretion" in administration of liquidation); *Angoff v. Holland-Am. Ins. Co. Trust*, 937 S.W.2d 213, 217 (Mo. Ct. App. 1996) ("A receiver has broad discretion in conducting and managing a liquidation."). We therefore review a trial court's order establishing a final claim date for abuse of discretion. *In re Burlington Bagel Bakery, Inc.*, 150 Vt. 20, 22, 549 A.2d 1044, 1045 (1988) ("When a matter is left to the trial court's discretion, its action will not be reversed by this Court unless it appears that the court withheld or abused its discretion."); see also *Kreidler v. Cascade Nat'l Ins. Co.*, 321 P.3d 281, 287 (Wash. Ct. App. 2014) (concluding that trial court's order confirming receiver's final determination in insurer insolvency is subject to review for abuse of discretion).

¶ 22. ■ The trial court's discretion in setting a final claim date in this case is bounded by several intertwined legal considerations. First, any final claim date must be consistent with the terms and goals of the liquidation order. With respect to the distribution of Ambassador's assets, the order states that the liquidator "shall make distributions in a manner that will assure the proper recognition of priorities and a reasonable balance between the expeditious completion of the liquidation and the protection of unliquidated and undetermined claims, including third-party claims." The order states that "the priority of distribution as set forth in 8 V.S.A. § 3595 *shall* control." (Emphasis added). It contemplates that the liquidator will collect and distribute "all assets that can be economically collected and distributed," and that the only funds that may be transferred pursuant to discharge

a firm date must be set after which no more claims against the company will be received.").

of the liquidator are those "that are uneconomic to distribute." The order further contemplates that even after the liquidator has been discharged, upon the discovery of additional assets, the liquidation proceeding may be reopened. The order thus evinces both a resolve to distribute all estate assets that can be economically collected and distributed, and a commitment to the proper recognition of priorities.

¶ 23. ■ Second, any final claim date must be consistent with the critical goal of the liquidation process: the protection of the public in general and policyholders in particular. Liquidators are officers of the state who are required to protect policyholders, other creditors, and the public interest in the administration of an estate in liquidation. See *In re Liquidation of Integrity Ins. Co.*, 935 A.2d 1184, 1194 (N.J. 2007) (Long, J., dissenting) (stating that "heart" of New Jersey Rehabilitation and Liquidation Act is mandate "[t]hat the *broadest* protection be afforded to the public and various claimants and beneficiaries" (quotation omitted)); *Exec. Life Ins. Co.*, 38 Cal. Rptr. 2d at 459 (recognizing that commissioner, as liquidator, is "an officer of the state who . . . exercises the state's police power to carry forward the public interest and to protect policyholders and creditors of the insolvent insurer") (citation omitted). The policyholders in this case paid good money for the insurance they purchased. Members of the public who have sustained injuries for which the policyholders are liable may also suffer if the contracted-for insurance is not available to the policyholder. When an insurer is insolvent, frustration of some policyholders' contractual expectations and a lack of coverage for some injured innocent third parties may be inevitable, but courts and liquidators should be loath to cut off valid claims in the face of ample funds to pay those claims without good reason. See *PrimeHealth Corp. v. Ins. Comm'r*, 758 A.2d 539, 546 (Md. Ct. Spec. App. 2000) (commissioner appointed as receiver for insurance company has "duty to act with a broad view toward minimizing financial harm to *all* policyholders, creditors, and the general public") (emphasis added) (quotation omitted).

¶ 24. Two particular factual circumstances in this case also have significant bearing on the trial court's exercise of discretion with respect to a cutoff date. First, much of the insurance written by Ambassador — including the A.P. Green policies to which NICO is assignee — involved excess coverage for long-tail claims. Injury caused by the risks insured by Ambassador — including disease

caused by asbestos exposure — often does not declare itself until years, even decades, after the underlying exposure. See, e.g., *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1083 (5th Cir. 1973) (noting that asbestosis does not generally manifest itself until ten to twenty-five or more years after initial exposure); M. Veed, *Cutting the Gordian Knot: Long-Tail Claims in Insurance Insolvencies*, 34 Tort & Ins. L.J. 167, 169 (Fall 1998) (acknowledging that asbestos and environmental policies may have tails upwards of fifty years). If Ambassador was not in liquidation, and was instead operating as a going business, Ambassador would still face considerable exposure for known but unliquidated claims pursuant to the A.P. Green policies, as well as claims based on yet-to-be discovered injuries arising during the coverage period of those policies. Ambassador would still be holding reserves to cover such claims, with no artificial bar date above and beyond the applicable statutes of limitations, and A.P. Green would still reasonably rely on the coverage it had purchased in the early 1980s to satisfy those claims.

¶ 25. The reasonably expected time span between the coverage periods and the perfection of claims against Ambassador pursuant to that coverage is further extended because of Ambassador's status as an excess insurer. For example, Ambassador is only obligated to provide coverage to A.P. Green *after* three prior layers of insurance are exhausted. Moreover, as we noted in *Towns v. Northern Security Insurance Co.*, occurrence policies like those issued by Ambassador to A.P. Green are meant to provide more expansive coverage than cheaper claims-based policies, which restrict the insurer's risk to coverage of claims made during the policy period. 2008 VT 98, ¶ 29, 184 Vt. 322, 964 A.2d 1150. The policies in question were designed to have very long tails.

¶ 26. This factor alone points to the likely reasonableness of a liquidation proceeding that lasts for decades. The length of this liquidation proceeding is not out of line relative to the liquidations of other insurance companies that insured long-tail risks and became insolvent in the mid-1980s, including Transit Casualty Co., Integrity Insurance Co., and Midland Insurance Co. See *Transit Cas. Co.*, 280 S.W.3d at 622 (fourteen years, beginning in 1987 and ending in 2001); *Integrity Ins. Co.*, 935 A.2d at 1185 (nearly twenty-one years, beginning in 1987, and counting as of 2007); *In re Liquidation of Midland Ins. Co.*, 947 N.E.2d 1174, 1176 (N.Y.

2011) (twenty-five years, beginning in 1986, and counting as of 2011).

¶ 27. A second factor further impacts the final-claim-date analysis. In the typical liquidation, the insurance company is insolvent, meaning it lacks sufficient assets to meet its debts. In such cases, the limited assets relative to the outstanding debt generally force an end to the liquidation proceeding: at some point, the insolvent estate runs out of money, or its assets drop to a point where it becomes uneconomic to continue administering the estate. In this case, on the other hand, to the liquidator's credit, the liquidator has recovered quite substantial assets on Ambassador's behalf. The liquidator has approximately $92 million in Ambassador assets — more than enough to pay the $26 million in known fourth-priority claims, the approved fifth-priority claims, and the reasonable costs of administration. As the liquidator acknowledged in his testimony, Ambassador is *not* currently insolvent, although it may become insolvent in the future.

¶ 28. This factor distinguishes this case from the other long-tail insurance cases noted above. In the case of Integrity Insurance Co., a liquidation spanning over twenty years that began in 1987, the company was $800 million in debt when the liquidator proposed a plan for winding down the liquidation. *Integrity Ins. Co.*, 935 A.2d at 1186. That plan included a final cutoff date for claims using estimation and final distribution. *Id.* at 1186-87. In that case, the New Jersey Supreme Court noted that when an insolvent insurer finds it has a surplus, the applicable New Jersey statute allowed payment for contingent claims if the liquidation is conducted "upon the basis that such insurer is solvent," a provision it dismissed as irrelevant to Integrity. *Id.* at 1190. The court rejected a plan to wind up the twenty-one year old liquidation proceeding by paying policyholders amounts based on actuarial estimation rather than actual proven claims, even though its rejection of the plan would result in continued administrative costs. *Id.* at 1191.[10]

---

[10] In contrast to the liquidator here, the liquidator in *In re Liquidation of Integrity Insurance Co.* favored a liquidation plan that relied on actuarial estimation methods to include IBNR claims in the distribution, and took the position that a cutoff date barring contingent claims "would be manifestly unfair to many policyholders and third parties with contingent claims who would lose any recourse to the assets of Integrity's Estate. Further, this approach would have a serious impact on the insurance-consuming public because many of the contingent

¶ 29. Similarly, in the case of Midland Insurance Co., the company was still about $47 million insolvent after twenty-five years of liquidation when the liquidator moved for a final deadline for amendments to proofs of claim. *In re Liquidation of Midland Ins. Co.*, No. 41294/1986, 2011 WL 2652564, at *1 (N.Y. Sup. Ct. June 27, 2011).

¶ 30. ■ ■ Given these factors, we conclude that the trial court's final claim date does not strike a "reasonable balance between the expeditious completion of the liquidation and the protection of unliquidated and undetermined claims." When determining whether a final claim date achieves this reasonable balance, courts should consider, among other factors: (1) the company's remaining assets; (2) the nature and amount of its remaining liabilities; (3) the administration costs of the estate; and (4) the extent to which delay in termination of the liquidation proceedings results in a delay of full payment to priority claim holders. Here, these factors weigh against the final claim date of December 31, 2013 set by the trial court.

¶ 31. As noted above, Ambassador has ample resources to meet its known obligations to priority-four claimants ($26 million), to pay the $20 million in claims asserted by NICO, if they are established, to pay claimants with known but not yet liquidated priority-four claims (estimated in Ambassador's reserves to be around $18 million), to sustain its administrative costs for at least five years, and even to pay the bulk of known obligations to priority-five claimants. Given this circumstance, we cannot conclude that, as required by the liquidation order, "all assets that can be economically collected and distributed have been collected and distributed." In particular, the liquidator has not yet distributed "all assets that can be economically collected and distributed." Ambassador has sufficient funds to pay additional known and not yet liquidated, and even yet-unknown priority-four claims.

¶ 32. At the same time, Ambassador's prospective priority-four liabilities are substantial. This is not a case in which we can reasonably conclude that the lion's share of the insolvent insurer's obligations is substantially known and established by now, such that it would be uneconomical to extend the liquidation to keep the door open for a small number of exceptional claims. As noted

claims would be paid, in part or in full, by state insurance guaranty associations."
691 A.2d 898, 900 (N.J. Super. Ct. Ch. Div. 1996).

above, given the latency of the diseases covered by the policies in question, Ambassador's status as a fourth-layer excess provider in the case of the A.P. Green policies, the circumstance of A.P. Green's own bankruptcy and the delays that created in resolution of the claims against A.P. Green, it seems very likely on the basis of the A.P. Green policies alone that substantial obligations for covered risks remain unliquidated and unsatisfied. Likewise, the environmental risks covered by Ambassador have similarly long tails. It is not as though policyholders have had since 1987 to establish their claims. Their claims are only ripening now. There is no evidence that the bulk of the delay in claimants' submissions of qualifying proofs of claim is a result of foot-dragging or a lack of diligence; the long tail on these claims is intrinsic to the covered risks.

¶ 33. Lastly, relative to the remaining assets in the estate, Ambassador's ongoing operating expenses are modest. Its average annual operating expenses during the five year period preceding the October 2012 hearing were $1.6 million. Prospectively, the liquidator estimates that Ambassador's yearly operating expenses will be approximately $2 million. There is nothing in the record to suggest that the liquidator's continuing operating costs are so out of proportion to the prospective claims they are likely to pay as to render continuation of the liquidation uneconomic. Cf. *Integrity Ins. Co.*, 935 A.2d at 1191 (rejecting proposed final liquidation of estate that included IBNR claims using estimation methods despite ongoing prospective cost of administering estate, estimated to be $4.5 million per year with respect to insolvent estate).

¶ 34. Moreover, it is not the case that the interests of other priority-four claimants here would be substantially compromised by continuation of the liquidation. As of May 2012, all court-approved priority-four claims had been paid in full, plus interest. Cf. *id.* at 1187 (noting that keeping liquidation open until substantially all contingent claims became absolute would delay the full and final dividend to claimants and policyholders). In this case, no priority-four claimants are currently prejudiced by allowing additional time for those with known but unliquidated claims to perfect their claims, or for those with yet-unknown claims protected by policyholder-protection claims to make actual claims.

¶ 35. ■ We recognize that this liquidation has continued for quite some time — nearly three decades — but the length of the

liquidation is not in and of itself sufficient to justify cutting off valid but not fully ripe claims under the Ambassador policies when funds remain to pay those claims and the estate can be administered economically. The significance of the passage of time since the initial liquidation order is especially limited in this case where the liquidation estate received an infusion of over $200 million in 2008. The mere duration of the liquidation process in and of itself is not a basis for bringing it to a close, thereby frustrating the goal of protecting policyholders and other creditors, in the absence of specific factors warranting closure. A lack of sufficient funds to meet additional claims, a likelihood that further substantial claims will not be forthcoming, administrative costs disproportionate to the remaining assets to be collected or distributed, or prejudice to other priority claimants as a result of ongoing delay are all examples of the kinds of factors that may support a cutoff date. None of them apply here.

¶ 36. Our reversal of the trial court's cutoff-date order is supported by another consideration: the court's order does not accomplish its own stated goal. The trial court wrote, "The court's intention is to open the insolvent estate to as many legitimate claims as possible." The trial court appears to have contemplated that a bar date of December 31, 2013 would provide the policyholders who objected to the bar date sufficient time to perfect their claims by investigating and negotiating claims that are known now but not fully developed. At the time of oral argument, several weeks before the final bar date, the litigation between NICO and Ambassador concerning NICO's claim was ongoing. Given the continuing dispute as to whether A.P. Green's claims had already pierced Ambassador's layer of coverage, as well as A.P. Green's bankruptcy and its impact on the resolution of additional claims against A.P. Green that might implicate the Ambassador coverage if it was not already in play, we have serious doubts about the accuracy of the trial court's assumption that one year would provide sufficient time for perfection of the known-but-not-liquidated claims, and the record does not provide any specific support for this assumption.

¶ 37. ■ Given Ambassador's recent recovery, closure at this stage would undermine the general purpose of protecting policyholders whose claims could be covered in full by the available funds. See *Comm'r v. Mass. Accident Co.*, 50 N.E.2d 801, 805 (Mass. 1943) (noting that "large, if not the largest, interest in

almost any insurance company must be that of policyholders who have not yet suffered loss, and that the solvency of the company and whether it should be allowed to continue business should depend upon its probable ability to meet the future claims of such policyholders"). We are mindful that given the nature of the risks insured, Ambassador's policyholders likely still face substantial exposure for risks covered by Ambassador policies. We are especially concerned about the known claims that have not been perfected due to extrinsic factors reflecting no lack of diligence on the part of the policyholder. See *id.* ("It would be an anomaly if an adjudication of insolvency should itself have the effect of restoring the company to a sort of solvency through the immediate elimination of one of the principal blocks of its liabilities.").

¶ 38. We acknowledge that the trial court's final-claim date would allow payouts to priority-five claimants, but reject the proposition that a desire to pay priority-five claims in full itself provides a reason to close the door to unperfected priority-four claims. Given the statutorily mandated priority scheme adopted in the liquidation order, any payment to lower priority claimants before Ambassador satisfies its obligations to higher-priority claimants would be a windfall to those lower-priority claimants. In the case of insolvent insurance companies, just as in the case of bankruptcies, unsecured creditors of the lowest level of priority often recover cents on the dollar, if they recover anything at all. The notion that a priority-five claimant should be entitled to full payment while a priority-four claimant such as A.P. Green should be left without its contracted-for protection as a policyholder because of the long-tail nature of the risks for which it purchased coverage is squarely at odds with the distribution priorities reflected in the liquidation order and is unsupported by any authority.

¶ 39. We do not intend to leave the liquidator or the trial court with the Hobson's choice of "extinguish[ing] millions of dollars of occurrence-based coverage purchased by policyholders or . . . run[ning] out the Estate for years while hemorrhaging administrative costs and delaying payments to claimants with presently documented claims." *Integrity Ins. Co.*, 935 A.2d at 1192 (Long, J., dissenting). The estate's finite assets should stave off any concern that the liquidation will proceed "indefinitely," and the liquidation order contemplates such a time when "all assets that *can* be economically collected and distributed *have been* collected and

distributed." (Emphasis added.) But that time has not yet arrived. While we conclude that a final claim date is not appropriate at this time, nothing bars the liquidator from returning to the superior court and requesting a claim date when more is known about Ambassador's priority-four liability — knowledge that is forthcoming — or when Ambassador's assets have been depleted to the extent that continued administration of the liquidation estate is no longer economic.

¶ 40. Moreover, as the trial court noted, the circumstances of this case are dynamic and we may be close to more certainty with respect to Ambassador's liability to at least some priority-four claimants. The question of whether A.P. Green's claims have reached Ambassador's layer of coverage is currently before a court-appointed master but has not yet been resolved. Additionally, A.P. Green's own bankruptcy proceedings are moving forward and will further illuminate the extent of its asbestos-related claims. In an affidavit submitted to the trial court, the president of A.P. Green indicated that, as of September 2012, A.P. Green's reorganization plan was close to final confirmation. The plan provides for review, determination, and payment of the thousands of asbestos-related claims that have been pending but unreviewed since the commencement of A.P. Green's bankruptcy in 2002. These circumstances provide some reasonable assurance that the process of resolving the known and outstanding fourth-priority claims against the estate is continuing to move forward.

### III.

¶ 41. NICO also argues on appeal that (1) the trial court should have considered a final claim date only for unreported claims or allowed the liquidator to use actuarial estimation for unliquidated claims, and (2) in deciding the liquidator's motion for a final claim date, the court should have applied the liquidation statute enacted in 1991.

¶ 42. These two arguments are related. Neither the liquidation statute in force at the time of the liquidation order in this case, nor the new statute enacted in 1991, nor Ambassador's liquidation order explicitly addresses a final claim date or the use of claims estimation in winding down the liquidation. As the trial court noted, the liquidation statute in force at the time Ambassador's liquidation was ordered, 8 V.S.A. §§ 3591-3603 (repealed 1991), did not address the termination of liquidation at all. The new statute

enacted in 1991 does contain a provision addressing the termination of liquidation proceedings, but it merely echoes the liquidation order's language, albeit in different terms, providing that the liquidator may apply for discharge "[w]hen all assets justifying the expense of collection and distribution have been collected and distributed." 8 V.S.A. § 7085.

¶ 43. NICO argues that the 1991 statute governs questions concerning the termination of Ambassador's liquidation proceeding, and that provisions in that statute, 8 V.S.A. §§ 7076-7077, address unliquidated claims. Specifically, NICO cites 8 V.S.A. § 7076(b) for the proposition that contingent claims can participate in distributions in a liquidation proceeding. NICO reasons that if the statute provides for payment of contingent claims, the liquidator has a duty to accept determinations of their value by claim estimation or some other reasonable method because there must be some way of determining the claims' value. In the alternative, NICO argues that wholly apart from the 1991 statute, the court has the authority to amend the liquidation order, especially in light of the 2008 recovery of $205 million, to allow for resolution of the liquidation proceedings using estimation methods to determine the value of and to pay unliquidated claims.[11]

¶ 44. Ambassador responds that language in the liquidation order explicitly states that the substantive rights of Ambassador policyholders were fixed as of the date of the order's entry and the 1991 statute therefore does not apply. Ambassador further argues that the trial court did not abuse its discretion by refusing to use claims estimation or to set a final claim date for only unreported claims. It notes that when the Legislature enacted the 1991 liquidation statute it could have but did not allow claims estimation as a basis for payment of unliquidated claims and that there is no case law supporting a court's reliance on estimation where there is no statutory authorization. And Ambassador argues that if estimation is required for remaining claims, Ambassador's reinsurers will most certainly take the position that they have no obligation to pay based on estimates, and the estate will become involved in long-term, expensive and unnecessary litigation.

¶ 45. We decline to reach the issues raised by the parties as to estimation for two reasons. First and foremost, because we

---

[11] NICO did not raise this second argument below, and did not brief it, but advocated this position at oral argument.

conclude that the liquidator has not yet distributed all assets that "can be economically collected and distributed" and that the trial court's bar date was premature, we need not address NICO's arguments regarding unliquidated or contingent claims at this time. Second, although the question of the court's authority to amend the liquidation order to allow the use of estimation methods in winding down the estate is primarily a legal one, the legal analysis may require some understanding of the reliability of the actuarial methods that would be relied upon, as well as of the implications of using this method on reinsurers' obligations. There is an insufficient basis, both in terms of evidence in the record and in terms of briefing, to enable us to review this question.

*Reversed.*