NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Merrimack
No. 2021-0211


IN THE MATTER OF THE LIQUIDATION OF THE HOME INSURANCE
COMPANY


Argued: February 10, 2022
Opinion Issued: August 12, 2022

McLane Middleton, Professional Association, of Manchester (Mark C. Rouvalis and Viggo C. Fish on the brief), and Freeborn & Peters LLP, of Chicago, Illinois (Joseph T. McCullough IV and Peter B. Steffen on the brief, and Peter B. Steffen orally), for the appellant.


John M. Formella, attorney general (J. Christopher Marshall on the brief), and Rackemann, Sawyer & Brewster P.C., of Boston, Massachusetts (J. David Leslie, Eric A. Smith, and Margaret C. Fitzgerald on the brief, and J. David Leslie orally), for appellee Insurance Commissioner of the State of New Hampshire, as Liquidator of the Home Insurance Company.


Kazmarek Mowrey Cloud Laseter LLP, of Pittsburgh, Pennsylvania (Paul K. Stockman on the brief and orally), and Wadleigh, Starr & Peters, P.L.L.C., of Manchester (Michael J. Tierney on the brief), for appellees Bridgestone

Americas Tire Operations, LLC, Eli Lilly and Company, ViacomCBS Inc., and the Archdiocese of Saint Paul and Minneapolis Settlement Trust.


HANTZ MARCONI, J. This interlocutory appeal was filed by the appellant, Zurich Insurance plc, German Branch (Zurich), from an order of the Superior Court (Kissinger, J.) granting the motion of the Insurance Commissioner of the State of New Hampshire, as Liquidator (Liquidator) of the Home Insurance Company (Home), for approval of the Claim Amendment Deadline pursuant to the Insurers Rehabilitation and Liquidation Act (Act). See RSA ch. 402-C (2018 & Supp. 2021); see also Sup. Ct. R. 8(1); Super. Ct. R. 46(a). Policyholders Bridgestone Americas Tire Operations, LLC, Eli Lilly and Company, ViacomCBS Inc., and the Archdiocese of Saint Paul and Minneapolis Settlement Trust (policyholders), submitted a brief in support of the Claim Amendment Deadline.

The two questions presented are whether the superior court acted within its discretion: (1) "in granting the Liquidator's motion and approving the Claim Amendment Deadline on the law, facts and circumstances presented"; and (2) in concluding that the Claim Amendment Deadline strikes "a reasonable balance between the expeditious completion of the liquidation and the protection of unliquidated and undetermined claims" in accordance with RSA 402-C:46, I (2018). We answer both questions in the affirmative.

I.  Background

We accept the statement of the case and facts as presented in the interlocutory appeal statement and rely upon the record for additional facts as necessary. See State v. Hess Corp., 159 N.H. 256, 258 (2009). Home is a New Hampshire-domiciled insurance company, which wrote insurance and reinsurance in almost all fifty states as well as Canada, Bermuda, Hong Kong, and the United Kingdom. After experiencing financial difficulties, Home stopped writing new personal lines of business in the early 1990s. By 1995, Home had stopped writing all business, including commercial lines, with the exception of certain personal lines subject to renewal in a few states.

In June 2003, Home was declared insolvent and the Liquidator was appointed to administer and collect Home's assets for distribution to Home's creditors. See In the Matter of Liquidation of Home Ins. Co., 154 N.H. 472, 475 (2006) (Home I). The Order of Liquidation established June 13, 2004 as the deadline for filing claims, subject to provisions permitting the filing of late-filed claims. At least 20,785 proofs of claim have been filed with the Liquidator. In addition to proofs of claims for known claims, on which the amount of Home's liability was either quantified and due and owing or not yet established, claimants were allowed to file proofs of claim encompassing unknown or

potential claims. Claimants may update such proofs of claim after the June 13, 2004 deadline until the date of the Claim Amendment Deadline, which the Liquidator proposes to be established 150 days from the trial court's final order.

Before liquidation, Home participated in the insurance market in the United Kingdom as part of the American Foreign Insurance Association (AFIA). As an AFIA member, Home entered into various agreements whereby it reinsured certain insurance companies' risks (the AFIA cedents), including Zurich. In 1984, AFIA was purchased by Cigna and, as part of the transaction, a subsidiary of Cigna, the Insurance Company of North America (INA), assumed Home's reinsurance obligations with respect to AFIA. By agreement, INA was required to pay obligations directly to Home or the Liquidator in the event of Home's insolvency. In 1999, Century Indemnity Company (CIC) succeeded to INA's obligations.

When Home was declared insolvent in 2003, the reinsurance obligations became payable to the Liquidator based on the underlying AFIA cedents' claims allowed in the liquidation. The Liquidator determined that the AFIA cedents' claims are Class V claims under RSA 402-C:44 (2018), and no distribution to Class V creditors was anticipated under the order of distribution set forth in the statute. As incentive for the AFIA cedents to continue to file and prove their claims, so that the Liquidator could collect reinsurance to use to pay Class II creditors, the Liquidator entered into an agreement with the AFIA cedents (AFIA Agreement).

Under the AFIA Agreement, the AFIA cedents agreed to cede to the Liquidator their claims under the reinsurance contracts with Home and, in return for continuing to file and quantify their claims, the Liquidator would pay them a share of the reinsurance collected by the Liquidator from CIC as a Class I administrative cost. See RSA 402-C:44, I (2018). This court upheld the AFIA Agreement as fair and reasonable because the AFIA cedents would not have filed claims against the Home estate without a financial incentive and, most importantly, the agreement benefitted the Class II claimants by increasing the likelihood that their claims would be paid. Home I, 154 N.H. at 489-90. A Scheme of Arrangement (Scheme) was entered into in England to implement the AFIA Agreement.

As of May 31, 2019, the Liquidator had resolved 19,695 of 20,785 proofs of claim and allowed $2.705 billion of policy-related claims entitled to Class II priority and a total of $3.08 billion in claims at all priority classes. As of the same date, the Liquidator held $808 million in assets and had made early distribution to guaranty associations totaling $256 million, interim distributions at a 30% distribution percentage to non-guaranty association Class II creditors totaling $620 million, and applied $56 million of special deposits as setoffs for a total of approximately $1.74 billion in Home assets.

3

The Liquidator does not expect there to be sufficient assets to pay Class II claims in full or to make any distributions to claimants in lower priority classes.

In August 2019, the Liquidator moved for approval of the Claim Amendment Deadline for the submission or amendment of claims in the liquidation proceeding. The effect of the deadline would be to require claimants to identify all claims so that they may be determined, after which the final distribution percentage can be calculated and the final distribution paid. Claims not identified by the Claim Amendment Deadline would be barred.

The Liquidator asserted that "to move this proceeding to closure and protect the interests of creditors with allowed Class II claims," it was "necessary to establish a deadline by which claimants must finally amend their claims in order to provide the Liquidator with the specificity required for determination of claims." The Liquidator contended that establishing such a deadline was supported by five factors.

First, the Liquidator asserted, "there has been a lengthy period of time for claims against Home to emerge" — because Home stopped issuing policies in 1995 and has been in liquidation since 2003, claims under Home policies "have had at least twenty-three years to develop, and claimants have had sixteen years to assert them in the liquidation." Second, "the vast majority" of proofs of claim have been determined, "resolving 19,695 (almost 95%) of the 20,785 proofs of claim, including 17,370 (95%) of the 18,257 Class II proofs of claim." Third, because the "remaining open proofs of claim . . . involve 'long tail' exposures, such as asbestos or environmental exposures," "[a]bsent some requirement to update and substantiate their claims, these insureds are likely to prefer to keep them open and await future developments." Fourth, the Liquidator asserted that he had "collected a substantial part of the assets of the estate" and the remaining additional assets "principally consist of potential reinsurance recoveries that will not be realized unless underlying claims against Home are filed and proved." Finally, the Liquidator explained, "keeping the liquidation open requires the payment of the ongoing costs of administering the estate" of approximately $13 million per year. Given these circumstances, the Liquidator concluded that "the balance now clearly weighs in favor of establishing the Claim Amendment Deadline."

Zurich objected, arguing that the proposed deadline fails to strike the "reasonable balance" required by RSA 402-C:46, I. Zurich contended that the superior court should decline to set the proposed claims deadline, as it would "cut off" Zurich's ability to submit claims that were previously incurred but not yet reported (IBNR claims). In addition, Zurich argued that the Liquidator "should be estopped from imposing the proposed deadline" because it "is at odds with" the AFIA Agreement, Zurich's settlement with Home, and the Scheme.

4

Following a hearing, the superior court granted the Liquidator's motion. The court concluded that the Claim Amendment Deadline satisfied the "reasonable balance" standard set forth in RSA 402-C:46, I. Rejecting Zurich's objections, the court reasoned:

> Home has been in liquidation since June 2003, more than seventeen years ago. The only recoverable non-administrative claims that remain are those of Class II policyholders, whose claims have had at least twenty-three years to develop since the Home stopped providing material coverage in 1997. The Liquidator does not owe a duty under the Act to protect the undetermined claims of creditors below Class II, including those of the AFIA cedents, as the Home estate lacks assets sufficient to make distributions to Class II claimants. Consequently, the AFIA cedents' IBNR claims are not relevant to the "reasonable balance" analysis imposed by the Act.

(Citations omitted.) The court subsequently denied Zurich's motion for reconsideration, but stayed the effect of its order pending resolution of this interlocutory appeal.

II. The Act

The purpose of RSA chapter 402-C "is the protection of the interests of insureds, creditors, and the public generally, with minimum interference with the normal prerogatives of proprietors, through . . . [e]nhanced efficiency and economy of liquidation," and "[e]quitable apportionment of any unavoidable loss." RSA 402-C:1, IV(c), (d) (2018); see Home I, 154 N.H. at 488 (explaining that "the purpose of RSA chapter 402-C is to protect preferred creditors by reserving assets for them"). The Act "grants the liquidator broad authority to administer liquidation proceedings," as overseen by the superior court. Home I, 154 N.H. at 482. The chapter "shall be liberally construed to effect" its purpose. RSA 402-C:1, III (2018).

RSA 402-C:44 governs the order of distribution of claims from a liquidated insurer's estate, and establishes classes of claimants as part of the distribution process. RSA 402-C:44 (2018); see Home I, 154 N.H. at 475. Subject to a $50 per claim deductible, "every claim in each class shall be paid in full or adequate funds retained for the payment before the members of the next class receive any payment." RSA 402-C:44. The statute sets forth ten successive priority classes of claims against an insolvent estate and the order in which they shall be paid. See RSA 402-C:44, I-X. Costs of administering the liquidation are given first priority, RSA 402-C:44, I, followed by Class II priority claims, which include policy-related claims of insureds, third party claimants against insureds, and guaranty associations, RSA 402-C:44, II. See Home I, 154 N.H. at 475-76.

5

As to the distribution of assets upon liquidation, the Act provides that "[u]nder the direction of the court, the liquidator shall pay dividends in a manner that will assure the proper recognition of priorities and a reasonable balance between the expeditious completion of the liquidation and the protection of unliquidated and undetermined claims." RSA 402-C:46, I. "When all assets justifying the expense of collection and distribution have been collected and distributed under this chapter, the liquidator shall apply to the court for discharge." RSA 402-C:48 (2018).

III. Analysis

The questions before us ask whether the superior court acted within its discretion in granting the Liquidator's motion for the Claim Amendment Deadline. Thus, in reviewing the superior court's decision, we determine whether the record establishes an objective basis sufficient to sustain the discretionary judgment made. See State v. Lambert, 147 N.H. 295, 296 (2001). The party challenging the decision must demonstrate that the court's ruling was clearly untenable or unreasonable. See id.

Zurich argues that the superior court erred in granting the Liquidator's motion because it fails to strike a "reasonable balance" between the expeditious completion of the liquidation and the protection of IBNR claims since "the Liquidator provided no estimate of either [Home's] unrecovered assets or remaining liabilities that would allow such an analysis to take place." Acknowledging that there is "no binding New Hampshire authority directly on point," Zurich relies upon a Vermont Supreme Court case, In re Ambassador Insurance Company, Inc., 114 A.3d 492 (Vt. 2015), and asserts that the superior court erroneously failed to follow the test set forth in that case. The Liquidator counters that Zurich's reliance on Ambassador is misplaced. The Liquidator asserts that, unlike Ambassador where the company was solvent "and all its policyholder claims had been paid 'in full, with interest,'" here "Home's Class II creditors have only received 30% on their claims."

Ambassador involved the liquidation of Ambassador Insurance Company, Inc., an insurance company incorporated and domiciled in Vermont. Id. at 493. In 2008, in the course of the liquidation proceedings, the liquidator recovered $205 million from a judgment against Ambassador's auditor for professional malpractice. Id. at 494. Those funds allowed Ambassador to pay in full priority-four policyholders who had previously received only partial distributions. Id. As of 2012, all court-approved policyholder claims had been paid in full, with interest, and Ambassador had nearly $92 million in assets remaining. Id.

The liquidator moved to establish a deadline by which all claimants, including those who previously filed policyholder-protection claims, would need to file final proofs of claim. Id. at 494, 496. NICO, assignee of two excess

6

coverage policies with Ambassador, was in litigation over $20 million in claims stemming from an underlying suit related to asbestos exposure, and objected to the establishment of a final claim date, arguing that setting the date too soon would "unreasonably limit claimants' ability to submit proof of their claims." Id. at 495-96. Nonetheless, the trial court set December 31, 2013 as the final deadline. Id.

On appeal, NICO argued that, because Ambassador was solvent and the liquidator could "continue to cover all costs of administration in addition to paying claims," the final claim date did not "strike a reasonable balance between the need to wind up the liquidation and the rights of policyholders with unliquidated claims." Id. at 497. The Vermont Supreme Court agreed. Id. at 500.

At the outset, the court explained that the primary issue before it was "not whether the trial court had the legal authority to set a final claim date," or "whether the liquidation estate should remain open forever, with no deadline for presenting liquidated claims." Id. at 497. Rather, the question was "whether, given the unique circumstances of [the] case, the trial court erred in setting December 31, 2013 as a final date for submission of proofs of liquidated claims." Id.

Those "unique circumstances" included that the liquidator had "approximately $92 million in Ambassador assets—more than enough to pay the $26 million in known [policyholder] claims, the approved [priority-five] claims, and the reasonable costs of administration." Id. at 497, 500. Thus, Ambassador had "ample resources to meet its known obligations" to policyholder claimants ($26 million), "to pay the $20 million in claims asserted by NICO, if they [were] established, to pay claimants with known but not yet liquidated [policyholder] claims (estimated in Ambassador's reserves to be around $18 million), to sustain its administrative costs for at least five years, and even to pay the bulk of known obligations to [priority-five] claimants." Id. at 500-01. Given that Ambassador had "sufficient funds to pay additional known and not yet liquidated, and even yet-unknown [policyholder] claims," the court could not conclude that "all assets that [could] be economically collected and distributed [had] been collected and distributed." Id. at 501 (quotation omitted).

The court distinguished the case before it from "the typical liquidation" in which the insurance company is insolvent and "the limited assets relative to the outstanding debt generally force an end to the liquidation proceeding: at some point, the insolvent estate runs out of money, or its assets drop to a point where it becomes uneconomic to continue administering the estate." Id. at 500. The court also noted that "no [policyholder] claimants [were] currently prejudiced by allowing additional time for those with known but unliquidated

7

claims to perfect their claims, or for those with yet-unknown claims protected by policyholder-protection claims to make actual claims." Id. at 501.

We agree with the Liquidator that Ambassador is readily distinguishable from the circumstances presented here. As the Liquidator asserts, "in Ambassador, there were no interests of Class II policyholders weighing against holding the liquidation open," because "Ambassador was solvent, and all of its policyholder claims had been paid in full, with interest." (Emphasis and quotation omitted.) In contrast, here, as the superior court found, "Home is unable to pay all policyholder claimants in full, and it will be unable to issue final disbursements to policyholder claimants until a claim amendment deadline is approved." The fact that there are insufficient assets to make whole the priority Class II policyholders renders the analysis in Ambassador inapplicable to the determination in this case of whether the Claim Amendment Deadline satisfied the "reasonable balance" required by RSA 402-C:46, I. Accordingly, we disagree with Zurich that it was error for the superior court to decline to apply Ambassador.

Zurich also argues that the superior court erred in approving the Claim Amendment Deadline because imposing a deadline "is at odds with" the AFIA Agreement, Zurich's settlement agreement with Home, and the Scheme. The interpretation of a contract is a question of law, which we review de novo. In the Matter of Liquidation of Home Ins. Co., 157 N.H. 543, 546 (2008). When interpreting a written agreement, we give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole. Id. Absent ambiguity, the parties' intent will be determined from the plain meaning of the language used in the contract. Id.

As to the AFIA Agreement, Zurich does not point to any contractual language in support of its argument. Regarding Zurich's settlement agreement with Home, Zurich relies on language whereby Home agreed "to do all things necessary" to have policyholder claims admitted into Home's estate as Class I administrative expenses. As to the Scheme, Zurich relies on language that the Liquidator is to use "all reasonable endeavors" to collect amounts owed by reinsurers. We agree with the superior court that neither of these contract provisions "addresses how long the Liquidator is obligated to accept the filing of proofs of claim, nor purports to set aside generally applicable limitations the Liquidator may ordinarily impose on the filing of such claims."

We have reviewed Zurich's remaining arguments and determine that they are without merit and do not warrant further discussion. See Vogel v. Vogel, 137 N.H. 321, 322 (1993). Accordingly, we determine that the record establishes an objective basis sufficient to sustain the superior court's discretionary judgment that the Claim Amendment Deadline assures "a reasonable balance between the expeditious completion of the liquidation and

the protection of unliquidated and undetermined claims," RSA 402-C:46, I, and that Zurich has failed to demonstrate that the court's ruling was clearly untenable or unreasonable, Lambert, 147 N.H. at 296.

Affirmed and remanded.

HICKS and DONOVAN, JJ., concurred.